**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SUSAN LATTA; TRACI EHLERS; LORI WATSEN; SHARENE WATSEN; SHELIA ROBERTSON; ANDREA ALTMAYER; AMBER BEIERLE; RACHAEL ROBERTSON,<br>          *Plaintiffs-Appellees*,<br><br>v.<br><br>C. L. OTTER, "Butch"; Governor of the State of Idaho, in his official capacity,<br>          *Defendant-Appellant*,<br><br>and<br><br>CHRISTOPHER RICH, Recorder of Ada County, Idaho, in his official capacity,<br>          *Defendant*,<br><br>STATE OF IDAHO,<br>          *Intervenor-Defendant*. | No. 14-35420<br><br>D.C. No.<br>1:13-cv-00482-CWD |

| | |
|---|---|
| SUSAN LATTA; TRACI EHLERS; LORI WATSEN; SHARENE WATSEN; SHELIA ROBERTSON; ANDREA ALTMAYER; AMBER BEIERLE; RACHAEL ROBERTSON, *Plaintiffs-Appellees*, <br><br> v. <br><br> C. L. OTTER, "Butch"; Governor of the State of Idaho, in his official capacity, *Defendant*, <br><br> and <br><br> CHRISTOPHER RICH, Recorder of Ada County, Idaho, in his official capacity, *Defendant-Appellant*, <br><br> STATE OF IDAHO, *Intervenor-Defendant–Appellant*. | No. 14-35421 <br><br> D.C. No. 1:13-cv-00482-CWD |

Appeal from the United States District Court
for the District of Idaho
Candy W. Dale, Magistrate Judge, Presiding

BEVERLY SEVCIK; MARY
BARANOVICH; ANTIOCO CARRILLO;
THEODORE SMALL; KAREN GOODY;
KAREN VIBE; FLETCHER WHITWELL;
GREG FLAMER; MIKYLA MILLER;
KATRINA MILLER; ADELE
TERRANOVA; TARA NEWBERRY;
CAREN CAFFERATA-JENKINS;
FARRELL CAFFERATA-JENKINS;
MEGAN LANZ; SARA GEIGER,
            *Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, in his official
capacity as Governor of the State of
Nevada; DIANA ALBA, in her official
capacity as the County Clerk and
Commissioner of Civil Marriages for
Clark County, Nevada; AMY
HARVEY, in her official capacity as
the County Clerk and Commissioner
of Civil Marriages for Washoe
County, Nevada; ALAN GLOVER, in
his official capacity as the Clerk
Recorder for Carson City, Nevada,
            *Defendants-Appellees*,

and

COALITION FOR THE PROTECTION OF
MARRIAGE,
            *Intervenor-Defendant–Appellee*.

No. 12-17668

D.C. No.
2:12-cv-00578-
RCJ-PAL

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
September 8, 2014[*]—San Francisco, California

Filed October 7, 2014

Before: Stephen Reinhardt, Ronald M. Gould,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Reinhardt;
Concurrence by Judge Reinhardt;
Concurrence by Judge Berzon

---

[*] A disposition in *Jackson v. Abercrombie*, Nos. 12-16995 & 12-16998, is forthcoming separately.

# SUMMARY[**]

### Civil Rights

The panel affirmed the district court's judgment in *Latta v. Otter*, 14-35420/35421, and reversed the district court's judgment in *Sevcik v. Sandoval*, 12-17668, in suits brought by same-sex couples who live in Idaho and Nevada and wish either to marry there or to have marriages entered into elsewhere recognized in their home states.

Both Idaho and Nevada passed statutes and enacted constitutional amendments preventing same-sex couples from marrying and refusing to recognize same-sex marriages validly performed elsewhere. The panel held that the Idaho and Nevada laws at issue violate the Equal Protection Clause of the Fourteenth Amendment because they deny lesbians and gays who wish to marry persons of the same sex a right they afford to individuals who wish to marry persons of the opposite sex, and do not satisfy the heightened scrutiny standard the Court adopted in *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (9th Cir. 2014).

In the Nevada case, *Sevcik v. Sandoval*, the panel held that a case or controversy still existed, even though the Nevada state governor and clerk recorder had declined to continue pursuing the appeal. The panel also held that it was not precluded from hearing the appeal by *Baker v. Nelson*, 409 U.S. 810 (1972), because the case presented substantial federal questions. The panel stated that it would consider the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

briefs and oral argument offered by the Nevada intervenor, the Coalition for the Protection of Marriage.

In remanding *Sevcik v. Sandoval*, the panel instructed the district court to promptly issue an injunction permanently enjoining the state from enforcing any constitutional provision, statute, regulation or policy preventing otherwise qualified same-sex couples from marrying, or denying recognition to marriages celebrated in other jurisdictions which, if the spouses were not of the same sex, would be valid under the laws of the state.

Concurring, Judge Reinhardt wrote separately only to explain his view that the same-sex marriage bans invalidated also implicated plaintiffs' substantive due process rights.

Concurring, Judge Berzon agreed that Idaho and Nevada's same-sex marriage prohibitions fail because they discriminate on the basis of sexual orientation. Judge Berzon wrote separately because she was persuaded that Idaho and Nevada's same-sex marriage bans are also unconstitutional for another reason: They are classifications on the basis of gender that do not survive the level of scrutiny applicable to such classifications.

---

## COUNSEL

Lawrence G. Wasden, Attorney General, Steven L. Olsen, Chief of Civil Litigation Division, W. Scott Zanzig and Clay R. Smith, Deputy Attorneys General, Office of the Attorney General, Boise, Idaho, for Defendant-Appellant Christopher Rich and Intervenor-Defendant–Appellant State of Idaho.

Monte Neil Stewart (argued) and Daniel W. Bower, Stewart Taylor & Morris PLLC, Boise, Idaho; Thomas C. Perry and Cally A. Younger, Office of the Governor, Boise, Idaho, for Defendant-Appellant Governor C.L. "Butch" Otter.

Tara L. Borelli (argued), Lambda Legal Defense and Education Fund, Inc., Atlanta, Georgia; Jon W. Davidson, Peter C. Renn, and Shelbi D. Day, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California; Carla Christofferson, Dawn Sestito, Dimitri Portnoi, Melanie Cristol, and Rahi Azizi, O'Melveny & Myers LLP, Los Angeles, California; Kelly H. Dove and Marek P. Bute, Snell & Wilmer LLP, Las Vegas, Nevada, for Plaintiffs-Appellants Beverly Sevcik, Mary Baranovich, Antioco Carrillo, Theodore Small, Karen Goody, Karen Vibe, Fletcher Whitwell, Greg Flamer, Mikyla Miller, Katrina Miller, Adele Terranova, Tara Newberry, Caren Cafferata-Jenkins, Farrell Cafferata-Jenkins, Megan Lanz, and Sara Geiger.

Deborah A. Ferguson (argued), The Law Office of Deborah A. Ferguson, PLLC, Boise, Idaho; Craig Harrison Durham, Durham Law Office, PLLC, Boise, Idaho; Shannon P. Minter and Christopher F. Stoll, National Center for Lesbian Rights, San Francisco, California, for Plaintiffs-Appellees Susan Latta, Traci Ehlers, Lori Watsen, Sharene Watsen, Shelia Robertson, Andrea Altmeyer, Amber Beierle, and Rachael Robertson.

Catherine Cortez Masto, Attorney General, C. Wayne Howle, Solicitor General, Office of the Attorney General, Carson City, Nevada, for Defendant-Appellee Governor Brian Sandoval.

Neil A. Rombardo, District Attorney, Randal R. Munn, Chief Deputy District Attorney, Joseph L. Ward, Jr., Senior Deputy District Attorney, Carson City District Attorney's Office, Carson City, Nevada, for Defendant-Appellee Alan Glover.

Monte Neil Stewart (argued), Craig G. Taylor, and Daniel W. Bower, Stewart Taylor & Morris PLLC, Boise, Idaho, for Intervenor-Defendant–Appellee Coalition for the Protection of Marriage.

*Counsel for Amici*

Shannon P. Minter, Christopher F. Stoll, and Samantha Ames, National Center for Lesbian Rights, San Francisco, California, for Amici Curiae 13 Public Interest and Legal Service Organizations.

Michael L. Whitlock, Susan Baker Manning, Jared A. Craft, Sara Carian, John A. Polito, and Erik Wilson, Bingham McCutchen LLP, Washington, D.C., for Amici Curiae 27 Employers and Organizations Representing Employers.

Byron J. Babione, David Austin R. Nimocks, and James A. Campbell, Alliance Defending Freedom, Scottsdale, Arizona, for Amicus Curiae Alliance Defending Freedom.

Dean Robert Broyles, National Center for Law & Policy, Escondido, California, for Amicus Curiae Helen M. Alvare.

Staci J. Pratt and Allen Lichtenstein, ACLU of Nevada Foundation, Las Vegas, Nevada; Daniel M. Gluck and Lois K. Perrin, ACLU of Hawai'i Foundation, Honolulu, Hawai'i, for Amici Curiae American Civil Liberties Union Foundation

of Nevada and American Civil Liberties Union Foundation of Hawai'i.

Nathalie F.P. Gilfoyle, American Psychological Association, Washington D.C.; Paul M. Smith, Jenner & Block LLP, Washington, D.C., for Amici Curiae American Psychological Association, American Psychiatric Association, and National Association of Social Workers.

Nathalie F.P. Gilfoyle, American Psychological Association, Washington, D.C.; Paul M. Smith, Jenner & Block LLP, Washington, D.C., for Amici Curiae American Psychological Association, National Association of Social Workers, American Association for Marriage and Family Therapy, American Psychoanalytic Association, and Hawaii Psychological Association.

Carmine D. Boccuzzi, Jr., Mark A. Lightner, Andra Troy, and Andrew P. Meiser, Cleary Gottlieb Steen & Hamilton LLP, New York, New York, for Amicus Curiae American Sociological Association.

Rocky C. Tsai, Samuel P. Bickett, and Rebecca Harlow, Ropes & Gray LLP, San Francisco, California; Steven M. Freeman, Seth M. Marnin, and Michelle Deutchman, Anti-Defamation League, New York, New York, for Amici Curiae Anti-Defamation League, Americans United for the Separation of Church and State, Bend the Arc: A Jewish Partnership for Justice, Central Conference of American Rabbis, Global Justice Institute, Hadassah, the Women's Zionist Organization of America, Hindu American Foundation, Interfaith Alliance Foundation, Japanese American Citizens League, Jewish Social Policy Action Network, Keshet, Metropolitan Community Churches, More

Light Presbyterians, National Council of Jewish Women, Nehirim, People for the American Way Foundation, Presbyterian Welcome, Reconcilingworks: Lutherans for Full Participation, Reconstructionist Rabbinical College and Jewish Reconstructionist Communities, Sikh American Legal Defense and Education Fund, Society for Humanistic Judaism, T'ruah: The Rabbinic Call for Human Rights, Women of Reform Judaism, and Women's League for Conservative Judaism.

Rocky C. Tsai, Samuel P. Bickett, Rebecca Harlow, and Idin Kashefipour, Ropes & Gray LLP, San Francisco, California; Steven M. Freeman, Seth M. Marnin, and Michelle Deutchman, Anti-Defamation League, New York, New York; Eric Alan Isaacson, Anti-Defamation League, San Diego, California, for Amici Curiae Anti-Defamation League, Americans United for Separation of Church and State, Bend the Arc: A Jewish Partnership for Justice, Board of Trustees of the Pacific Central District/Unitarian Universalist Association, Hadassah, the Women's Zionist Organization of America, Hindu American Foundation, Interfaith Alliance Foundation, Interfaith Alliance Hawai'i, Japanese American Citizens League, Keshet, National Council of Jewish Women, Metropolitan Community Churches, More Light Presbyterians, Nehirim, Pacific Central District/Unitarian Universalist Association, Pacific Southwest District/Unitarian Universalist Association, People for the American Way Foundation, Reconcilingworks: Lutherans for Full Participation, Religious Institute, Inc., Sikh American Legal Defense and Education Fund, Society for Humanistic Judaism, South Asian Americans Leading Together, Southern California Nevada Conference of the United Church of Christ, T'ruah: The Rabbinic Call for Human Rights, Union for Reform Judaism, Central Conference of American Rabbis,

Women of Reform Judaism, Unitarian Universalist Association, Universal Fellowship of Metropolitan Community Churches, and Women's League for Conservative Judaism.

Jyotin Hamid and Joseph Rome, Debevoise & Plimpton LLP, New York, New York, for Amicus Curiae Professor Carlos A. Ball.

Daniel McNeel Lane, Jr., Akin Gump Strauss Hauer & Feld LLP, San Antonio, Texas; Jessica M. Weisel, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California, for Amici Curiae Historians of Marriage Peter W. Bardaglio, Norma Basch, Stephanie Coontz, Nancy F. Cott, Toby L. Ditz, Laura F. Edwards, Michael Grossberg, Hendrik Hartog, Ellen Herman, Martha Hodes, Linda K. Kerber, Alice Kessler-Harris, Elaine Tyler May, Serena Mayeri, Steve Mintz, Elizabeth Pleck, Carole Shammas, Mary L. Shanley, Amy Dru Stanley, and Barbara Welke.

Jerome C. Roth and Amelia L. B. Sargent, Munger, Tolles & Olson LLP, San Francisco, California, for Amici Curiae Bay Area Lawyers for Individual Freedom, et al.

Jeffrey S. Trachtman, Norman C. Simon, Jason M. Moff, Kurt M. Denk, and Jessica N. Witte, Kramer Levin Naftalis & Frankel LLP, New York, New York, for Amici Curiae Bishops of the Episcopal Church in Idaho, General Synod of the United Church of Christ, Mormons for Equality, Reconstructionist Rabbinical Association, Reconstructionist Rabbinical College and Jewish Reconstructionist Communities, Union for Reform Judaism, Unitarian Universalist Association, Affirmation, Covenant Network of Presbyterians, Methodist Federation for Social Action, More

Light Presbyterians, Presbyterian Welcome, Reconciling Ministries Network, Reconcilingworks: Lutherans for Full Participation, Religious Institute, Inc., and 38 Faith Leaders in the State of Idaho.

John C. Eastman, Center for Constitutional Jurisprudence, Chapman University, Orange, California; D. John Sauer, Clark & Sauer, LLC, St. Louis, Missouri, for Amici Curiae Center for Constitutional Jurisprudence and 27 Scholars of Federalism and Judicial Restraint.

Lynn D. Wardle, J. Reuben Clark Law School, Provo, Utah; Stephen Kent Ehat, Lindon, Utah, for Amici Curiae Center for Urban Renewal and Education, Coalition of African-American Pastors USA, and Frederick Douglass Foundation, Inc.

Suzanne B. Goldberg, Columbia Law School Sexuality and Gender Law Clinic, New York, New York, for Amicus Curiae Columbia Law School Sexuality and Gender Law Clinic.

Holly Carmichael, San Jose, California, for Amicus Curiae Concerned Women for America.

Lawrence J. Joseph, Law Office of Lawrence J. Joseph, Washington, D.C., for Amicus Curiae Eagle Forum Education and Legal Defense Fund.

Katherine Keating and Robert Esposito, Bryan Cave LLP, San Francisco, California, for Amicus Curiae Family Equality Council and Colage.

K. Lee Marshall, Katherine Keating, Tracy Talbot, and Robert Esposito, Bryan Cave LLP, San Francisco, California, for Amici Curiae Family Equality Council, Equality Hawaii Foundation, We Are Family, and Colage.

Joanna L. Grossman, Hofstra Law School, Hempstead, New York; Marjory A. Gentry, Arnold & Porter LLP, San Francisco, California, for Amici Curiae Family Law and Conflict of Laws Professors.

Joan Heifetz Hollinger, Berkeley School of Law, Berkeley, California; Courtney Joslin, UC Davis School of Law, Davis, California; Laura W. Brill and Meaghan L. Field, Kendall Brill & Klieger LLP, Los Angeles, California, for Amici Curiae Family Law Professors.

Elizabeth L. Deeley, Sarah E. Piepmeier, and Raghay Krishnapriyan, Kirkland & Ellis LLP, San Francisco, California, for Amicus Curiae Gary J. Gates.

Brad W. Seiling and Benjamin G. Shatz, Manatt, Phelps & Phillips, LLP, Los Angeles, California, for Amicus Curiae Gary J. Gates.

Mary L. Bonauto, Gay & Lesbian Advocates & Defenders, Boston, Massachusetts, for Amicus Curiae Gay & Lesbian Advocates & Defenders.

Charles S. Limandri, Freedom of Conscience Defense Fund, Rancho Santa Fe, California, for Amici Curiae Robert P. George, Sherif Girgis, and Ryan T. Anderson.

Nicholas M. O'Donnell, Sullivan & Worcester LLP, Boston, Massachusetts, for Amicus Curiae GLMA - Health Professionals Advancing LGBT Equality.

Lynn D. Wardle, Brigham Young University Law School, Provo, Utah, for Amici Curiae Professors Alan J. Hawkins and Jason S. Carroll.

Rita F. Lin and Sara Bartel, Morrison & Foerster LLP, San Francisco, California, for Amici Curiae Joan Heifetz Hollinger, Courtney Joslin, and 63 Other Family Law Professors.

Catherine E. Stetson, Erica Knievel-Songer, Mary Helen Wimberly, Madeline H. Gitomer, Jenna N. Jacobson, Hogan Lovells US LLP, Washington D.C., for Amicus Curiae Historians of Antigay Discrimination.

Aderson Bellegarde François, Howard University School of Law Civil Rights Clinic, Washington, D.C.; Brad W. Seiling and Benjamin G. Shatz, Manatt, Phelps & Phillips, LLP, Los Angeles, California, for Amicus Curiae Howard University School of Law Civil Rights Clinic.

Gregory F. Zoeller, Attorney General, and Thomas M. Fisher, Solicitor General, Office of the Attorney General of Indiana, Indianapolis, Indiana; Luther Strange, Attorney General, State of Alabama; Michael C. Geraghty, Attorney General, State of Alaska; Thomas C. Horne, Attorney General, State of Arizona; John Suthers, Attorney General, State of Colorado; Lawrence G. Wasden, Attorney General, State of Idaho; Timothy C. Fox, Attorney General, State of Montana; Jon Bruning, Attorney General, State of Nebraska; E. Scott Pruitt, Attorney General, State of Oklahoma; Alan Wilson,

Attorney General, State of South Carolina; Sean Reyes, Attorney General, State of Utah, for Amici Curiae States of Indiana, Alabama, Alaska, Arizona, Colorado, Idaho, Montana, Nebraska, Oklahoma, South Carolina and Utah.

Robert H. Tyler and Jennifer L. Bursch, Advocates for Faith and Freedom, Murrieta, California, for Amicus Curiae Institute for Marriage and Public Policy.

G. David Carter, Joseph P. Bowser, and Hunter T. Carter, Arent Fox LLP, Washington, D.C., for Amici Curiae Law Enforcement Officers, First Responders, and Organizations.

Stephen M. Crampton, Mary E. McAlister, and Mandi D. Campbell, Liberty Counsel, Lynchburg, Virginia; Mathew D. Staver and Anita L. Staver, Liberty Counsel, Orlando, Florida, for Amici Curiae Liberty Counsel.

William C. Duncan, Marriage Law Foundation, Lehi, Utah, for Amicus Curiae Marriage Law Foundation.

Martha Coakley, Attorney General, Genevieve C. Nadeau and Jonathan B. Miller, Assistant Attorneys General, Commonwealth of Massachusetts, Office of the Attorney General, Boston, Massachusetts; Kamala D. Harris, Attorney General of California, Sacramento, California; George Jepsen, Attorney General of Connecticut, Hartford, Connecticut; Joseph R. Biden, III, Attorney General of Delaware, Department of Justice, Wilmington, Delaware; Irvin B. Nathan, Attorney General for the District of Columbia, Washington, D.C.; Lisa Madigan, Attorney General of Illinois, Chicago, Illinois; Tom Miller, Attorney General of Iowa, Des Moines, Iowa; Janet T. Mills, Attorney General of Maine, Augusta, Maine; Douglas F. Gansler,

Attorney General of Maryland, Baltimore, Maryland; Joseph A. Foster, Attorney General of New Hampshire, Concord, New Hampshire; Gary K. King, Attorney General of New Mexico, Santa Fe, New Mexico; Eric T. Schneiderman, Attorney General of New York, New York, New York; Ellen F. Rosenblum, Attorney General of Oregon, Salem, Oregon; William H. Sorrell, Attorney General of Vermont, Montpelier, Vermont; Robert W. Ferguson, Attorney General of Washington, Olympia, Washington, for Amici Curiae Massachusetts, California, Connecticut, Delaware, District of Columbia, Illinois, Iowa, Maine, Maryland, New Hampshire, New Mexico, New York, Oregon, Vermont, and Washington.

Gerard V. Bradley, Notre Dame Law School, Notre Dame, Indiana, for Amicus Curiae Dr. Paul McHugh.

Sherrilyn Ifill, Christina A. Swarns, Natasha M. Korgaonkar, and Ria Tabacco Mar, NAACP Legal Defense & Educational Fund, Inc., New York, New York, for Amicus Curiae NAACP Legal Defense & Educational Fund, Inc.

Bruce A. Wessel, Moez M. Kaba, C. Mitchell Hendy, and Brian Eggleston, Irell & Manella LLP, Los Angeles, California, for Amici Curiae National and Western States Women's Rights Organizations.

Marcia D. Greenberger and Emily J. Martin, National Women's Law Center, Washington, D.C., for Amici Curiae National Women's Law Center, Gender Justice, Legal Momentum, Legal Voice, National Association of Women Lawyers, National Partnership for Women & Families, Southwest Women's Law Center, Women Lawyers Association of Michigan, Women's Law Project, and Professors of Law Associated with the Williams Institute.

Marcia D. Greenberger, Emily J. Martin, and Cortelyou C. Kenney, National Women's Law Center, Washington, D.C.; David C. Codell, Williams Institute, UCLA School of Law, Los Angeles, California, for Amici Curiae National Women's Law Center, Williams Institute Scholars of Sexual Orientation and Gender Law, and Women's Legal Groups.

Abbe David Lowell and Christopher D. Man, Chadbourne & Parke LLP, Washington, D.C., for Amici Curiae Outserve - SLDN and American Military Partner Association.

Kevin T. Snider, Pacific Justice Institute, Sacramento, California, for Amicus Curiae Pacific Justice Institute.

Jiyun Cameron Lee and Andrew J. Davis, Folger Levin LLP, San Francisco, California, for Amicus Curiae Parents, Families and Friends of Lesbians and Gays, Inc.

Mark W. Mosier and Jennifer Schwartz, Covington & Burling LLP, Washington, D.C., for Amici Curiae Political Science Professors.

Abram J. Pafford, Pafford Lawrence & Childress PLLC, Washington, D.C., for Amici Curiae Professors of Social Science.

David Alan Robinson, North Haven, Connecticut, for Amicus Curiae David Alan Robinson.

Alexander Dushku, R. Shawn Gunnarson, and Justin W. Starr, Kirton & McConkie, Salt Lake City, Utah, for Amici Curiae United States Conference of Catholic Bishops, National Association of Evangelicals, Church of Jesus Christ of Latter-Day Saints, Ethics & Religious Liberty Commission

of the Southern Baptist Convention, and Lutheran Church -
Missouri Synod.

---

## ORDER

These cases are consolidated for purposes of disposition.

---

## OPINION

REINHARDT, Circuit Judge:

Both Idaho and Nevada have passed statutes and enacted
constitutional amendments preventing same-sex couples from
marrying and refusing to recognize same-sex marriages
validly performed elsewhere.[1] Plaintiffs, same-sex couples
who live in Idaho and Nevada and wish either to marry there

---

[1] Idaho Const. Art. III, § 28 ("A marriage between a man and a woman
is the only domestic legal union that shall be valid or recognized in this
state."); Idaho Code §§ 32-201 ("Marriage is a personal relation arising
out of a civil contract between a man and a woman . . . ."), 32-202
(identifying as qualified to marry "[a]ny unmarried male . . . and
unmarried female" of a certain age and "not otherwise disqualified."); 32-
209 ("All marriages contracted without this state, which would be valid
by the laws of the state or country in which the same were contracted, are
valid in this state, unless they violate the public policy of this state.
Marriages that violate the public policy of this state include, but are not
limited to, same-sex marriage, and marriages entered into under the laws
of another state or country with the intent to evade the prohibitions of the
marriage laws of this state."); Nev. Const. Art. 1, § 21 ("Only a marriage
between a male and female person shall be recognized and given effect in
this state."); Nev. Rev. Stat. § 122.020(1) ("[A] male and female person
. . . may be joined in marriage.").

or to have marriages entered into elsewhere recognized in their home states, have sued for declaratory relief and to enjoin the enforcement of these laws. They argue that the laws are subject to heightened scrutiny because they deprive plaintiffs of the fundamental due process right to marriage, and because they deny them equal protection of the law by discriminating against them on the bases of their sexual orientation and their sex. In response, Governor Otter, Recorder Rich, and the State of Idaho, along with the Nevada intervenors, the Coalition for the Protection of Marriage ("the Coalition"), argue that their laws survive heightened scrutiny, primarily because the states have a compelling interest in sending a message of support for the institution of opposite-sex marriage. They argue that permitting same-sex marriage will seriously undermine this message, and contend that the institution of opposite-sex marriage is important because it encourages people who procreate to be responsible parents, and because opposite-sex parents are better for children than same-sex parents.

Without the benefit of our decision in *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (9th Cir. 2014), *reh'g en banc denied*, 759 F.3d 990 (9th Cir. 2014), the *Sevcik* district court applied rational basis review and upheld Nevada's laws. *Sevcik v. Sandoval*, 911 F. Supp. 2d 996 (D. Nev. 2012). After we decided *SmithKline*, the *Latta* district court concluded that heightened scrutiny applied to Idaho's laws because they discriminated based on sexual orientation, and invalidated them.[2] *Latta v. Otter*, No. 1:13-CV-00482-

---

[2] The *Latta* court also found a due process violation because, it concluded, the laws curtailed plaintiffs' fundamental right to marry. *Latta v. Otter*, No. 1:13-CV-00482-CWD, 2014 WL 1909999, at *9–13 (D. Idaho May 13, 2014).

CWD, 2014 WL 1909999, at \*14–18 (D. Idaho May 13, 2014). We hold that the Idaho and Nevada laws at issue violate the Equal Protection Clause of the Fourteenth Amendment because they deny lesbians and gays[3] who wish to marry persons of the same sex a right they afford to individuals who wish to marry persons of the opposite sex, and do not satisfy the heightened scrutiny standard we adopted in *SmithKline*.

## I.

Before we reach the merits, we must address two preliminary matters: first, whether an Article III case or controversy still exists in *Sevcik*, since Nevada's government officials have ceased to defend their laws' constitutionality; and second, whether the Supreme Court's summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972), is controlling precedent that precludes us from considering plaintiffs' claims.

## A.

Governor Sandoval and Clerk-Recorder Glover initially defended Nevada's laws in the district court. However, they have since withdrawn their answering briefs from consideration by this Court, in light of our decision in *SmithKline*, 740 F.3d at 480–81 (holding heightened scrutiny

---

[3] We have recognized that "[s]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them." *Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir. 2005), *vacated*, 547 U.S. 183 (2006).

applicable). Governor Sandoval now asserts that *United States v. Windsor*, 133 S. Ct. 2675 (2013), "signifies that discrimination against same-sex couples is unconstitutional," and that "[a]ny uncertainty regarding the interpretation of *Windsor* was . . . dispelled" by *SmithKline*. As a result, we have not considered those briefs, and the Governor and Clerk-Recorder were not heard at oral argument, pursuant to Fed. R. App. P. 31(c).

The Nevada Governor and Clerk Recorder remain parties, however, and continue to enforce the laws at issue on the basis of a judgment in their favor below. As a result, we are still presented with a live case or controversy in need of resolution. Despite the fact that Nevada "largely agree[s] with the opposing party on the merits of the controversy, there is sufficient adverseness and an adequate basis for jurisdiction in the fact the [state] intend[s] to enforce the challenged law against that party." *Windsor*, 133 S. Ct. at 2686–87 (citation and quotation marks omitted). Although the state defendants withdrew their briefs, we are required to ascertain and rule on the merits arguments in the case, rather than ruling automatically in favor of plaintiffs-appellants. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 887 n.7 (9th Cir. 2010) ("[Defendant's] failure to file a brief does not compel a ruling in [plaintiff's] favor, given that the only sanction for failure to file an answering brief is forfeiture of oral argument.").

There remains a question of identifying the appropriate parties to the case before us—specifically, whether we should consider the arguments put forward by the Nevada intervenor, the Coalition for the Protection of Marriage. As plaintiffs consented to their intervention in the district court—at a point in the litigation before Governor Sandoval and Clerk-

Recorder Glover indicated that they would no longer argue in support of the laws—and continue to so consent, the propriety of the intervenor's participation has never been adjudicated.

Because the state defendants have withdrawn their merits briefs, we face a situation akin to that in *Windsor*. There, a case or controversy remained between Windsor and the United States, which agreed with her that the Defense of Marriage Act was unconstitutional but nonetheless refused to refund the estate tax she had paid. Here as there, the state defendants' "agreement with [plaintiffs'] legal argument raises the risk that instead of a real, earnest and vital controversy, the Court faces a friendly, non-adversary proceeding . . . ." 133 S. Ct. at 2687 (citations and quotation marks omitted). Hearing from the Coalition helps us "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). As a result, we consider the briefs and oral argument offered by the Coalition, which, Governor Sandoval believes, "canvass the arguments against the Appellants' position and the related policy considerations."[4]

### B.

Defendants argue that we are precluded from hearing this case by *Baker*, 409 U.S. 810. In that case, the Minnesota

---

[4] For the sake of convenience, we refer throughout this opinion to arguments advanced generally by "defendants"; by this we mean the parties that continue actively to argue in defense of the laws—the Idaho defendants and the Nevada intervenor—and not Governor Sandoval and Clerk-Recorder Glover.

Supreme Court had rejected due process and equal protection challenges to a state law limiting marriage to a man and a woman. 191 N.W.2d 185, 186–87 (Minn. 1971). The United States Supreme Court summarily dismissed an appeal from that decision  "for want of a substantial federal question." *Baker*, 409 U.S. at 810. Such summary dismissals "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions," *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam), until "doctrinal developments indicate otherwise," *Hicks v. Miranda*, 422 U.S. 332, 343–44 (1975) (citation and quotation marks omitted). Defendants contend that this decades-old case is still good law, and therefore bars us from concluding that same-sex couples have a due process or equal protection right to marriage.

However, "subsequent decisions of the Supreme Court" not only "suggest" but make clear that the claims before us present substantial federal questions.[5] *Wright v. Lane Cnty. Dist. Ct.*, 647 F.2d 940, 941 (9th Cir. 1981); *see Windsor*, 133 S. Ct. at 2694–96 (holding unconstitutional under the Fifth Amendment a federal law recognizing opposite-sex-sex but not same-sex marriages because its "principal purpose

---

[5] To be sure, the Court made explicit in *Windsor* and *Lawrence* that it was not deciding whether states were required to allow same-sex couples to marry. *Windsor*, 133 S. Ct. at 2696 ("This opinion and its holding are confined to those lawful marriages [recognized by states]."); *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) ("The present case . . . does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."). The Court did not reach the question we decide here because it was not presented to it. Although these cases did not tell us the *answers* to the federal questions before us, *Windsor* and *Lawrence* make clear that these are substantial federal *questions* we, as federal judges, must hear and decide.

[was] to impose inequality, not for other reasons like governmental efficiency"); *Lawrence v. Texas*, 539 U.S. 558, 578–79 (2003) (recognizing a due process right to engage in intimate conduct, including with a partner of the same sex); *Romer v. Evans*, 517 U.S. 620, 631–34 (1996) (invalidating as an irrational denial of equal protection a state law barring protection of lesbians and gays under state or local anti-discrimination legislation or administrative policies). Three other circuits have issued opinions striking down laws like those at issue here since *Windsor*, and all agree that *Baker* no longer precludes review. *Accord Baskin v. Bogan*, No. 14-2386, 2014 WL 4359059, at *7 (7th Cir. Sept. 4, 2014); *Bostic v. Schaefer*, 760 F.3d 352, 373–75 (4th Cir. 2014); *Kitchen v. Herbert*, 755 F.3d 1193, 1204–08 (10th Cir. 2014). As any observer of the Supreme Court cannot help but realize, this case and others like it present not only substantial but pressing federal questions.

## II.

Plaintiffs are ordinary Idahoans and Nevadans. One teaches deaf children. Another is a warehouse manager. A third is an historian. Most are parents. Like all human beings, their lives are given greater meaning by their intimate, loving, committed relationships with their partners and children. "The common vocabulary of family life and belonging that other[s] [] may take for granted" is, as the Idaho plaintiffs put it, denied to them—as are all of the concrete legal rights, responsibilities, and financial benefits afforded opposite-sex

married couples by state and federal law[6]—merely because of their sexual orientation.

Defendants argue that their same-sex marriage bans do not discriminate on the basis of sexual orientation, but rather on the basis of procreative capacity. Effectively if not explicitly, they assert that while these laws may disadvantage same-sex couples and their children, heightened scrutiny is not appropriate because differential treatment by sexual orientation is an incidental effect of, but not the reason for,

---

[6] Nevada, unlike Idaho, has enacted a domestic partnership regime. Since 2009, both same-sex and opposite-sex couples have been allowed to register as domestic partners. Nev. Rev. Stat. §§ 122A.100, 122A.010 *et seq*. Domestic partners are generally treated like married couples for purposes of rights and responsibilities—including with respect to children—under state law. However, domestic partners are denied nearly all of the benefits afforded married couples under federal law—including, since *Windsor*, same-sex couples married under state law.

The fact that Nevada has seen fit to give same-sex couples the opportunity to enjoy the benefits afforded married couples by state law makes its case for the constitutionality of its regime even weaker than Idaho's. With the concrete differences in treatment gone, all that is left is a message of disfavor. The Supreme Court has "repeatedly emphasized [that] discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants," can cause serious "injuries to those who are denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (citation omitted).

If Nevada were concerned, as the Coalition purports it to be, that state recognition of same-sex unions would make the institution of marriage "genderless" and thereby undermine opposite-sex spouses' commitments to each other and their children, it would be ill-advised to permit opposite-sex couples to participate in the alternative domestic partnership regime it has established. However, Nevada does just that.

those laws. However, the laws at issue distinguish on their face between opposite-sex couples, who are permitted to marry and whose out-of-state marriages are recognized, and same-sex couples, who are not permitted to marry and whose marriages are not recognized. Whether facial discrimination exists "does not depend on why" a policy discriminates, "but rather on the explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Hence, while the procreative capacity distinction that defendants seek to draw could in theory represent a *justification* for the discrimination worked by the laws, it cannot overcome the inescapable conclusion that Idaho and Nevada do discriminate on the basis of sexual orientation.

In *SmithKline*, we held that classifications on the basis of sexual orientation are subject to heightened scrutiny. 740 F.3d at 474. We explained:

> In its words and its deed, *Windsor* established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review. In other words, *Windsor* requires that heightened scrutiny be applied to equal protection claims involving sexual orientation.

*Id.* at 481.

*Windsor*, we reasoned, applied heightened scrutiny in considering not the Defense of Marriage Act's hypothetical

rationales but its actual, motivating purposes.[7] *SmithKline*, 740 F.3d at 481. We also noted that *Windsor* declined to adopt the strong presumption in favor of constitutionality and the heavy deference to legislative judgments characteristic of rational basis review. *Id.* at 483. We concluded:

> *Windsor* requires that when state action discriminates on the basis of sexual orientation, we must examine its actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.

*Id*.

We proceed by applying the law of our circuit regarding the applicable level of scrutiny. Because Idaho and Nevada's laws discriminate on the basis of sexual orientation, that level is heightened scrutiny.

## III.

Defendants argue that their marriage laws survive heightened scrutiny because they promote child welfare by

---

[7] Although as discussed in the text, *SmithKline* instructs us to consider the states' actual reasons, and not post-hoc justifications, for enacting the laws at issue, these actual reasons are hard to ascertain in this case. Some of the statutory and constitutional provisions before us were enacted by state legislatures and some were enacted by voters, and we have been informed by all parties that the legislative histories are sparse. We shall assume, therefore, that the justifications offered in defendants' briefs were in fact the actual motivations for the laws.

encouraging optimal parenting. Governor Otter argues that same-sex marriage "teaches *everyone*—married and unmarried, gay and straight, men and women, and all the children—that a child knowing and being reared by her mother and father is neither socially preferred nor officially encouraged." Governor Otter seeks to have the state send the opposite message to all Idahoans: that a child reared by its biological parents *is* socially preferred and officially encouraged.

This argument takes two related forms: First, defendants make a "procreative channeling" argument: that the norms of opposite-sex marriage ensure that as many children as possible are raised by their married biological mothers and fathers. They claim that same-sex marriage will undermine those existing norms, which encourage people in opposite-sex relationships to place their children's interests above their own and preserve intact family units, instead of pursuing their own emotional and sexual needs elsewhere. In short, they argue that allowing same-sex marriages will adversely affect opposite-sex marriage by reducing its appeal to heterosexuals, and will reduce the chance that accidental pregnancy will lead to marriage. Second, Governor Otter and the Coalition (but not the state of Idaho) argue that limiting marriage to opposite-sex couples promotes child welfare because children are most likely to thrive if raised by two parents of opposite sexes, since, they assert, mothers and fathers have "complementary" approaches to parenting.[8] Thus, they

---

[8] These arguments are not novel. The Bipartisan Legal Advisory Group (BLAG) relied in part on similar contentions about procreative channeling and gender complementarity in its attempt to justify the federal Defense of Marriage Act, but the Court did not credit them. Brief on the Merits for

contend, children raised by opposite-sex couples receive a better upbringing.

## A.

We pause briefly before considering the substance of defendants' arguments to address the contention that their conclusions about the future effects of same-sex marriage on parenting are legislative facts entitled to deference. Defendants have not demonstrated that the Idaho and Nevada legislatures actually found the facts asserted in their briefs; even if they had, deference would not be warranted.

Unsupported legislative conclusions as to whether particular policies will have societal effects of the sort at issue in this case—determinations which often, as here, implicate constitutional rights—have not been afforded deference by the Court. To the contrary, we "retain[] an independent constitutional duty to review factual findings where constitutional rights are at stake. . . . Uncritical deference to [legislatures'] factual findings in these cases is inappropriate." *Gonzales v. Carhart*, 550 U.S. 124, 165–66 (2007); *see also Hodgson v. Minnesota*, 497 U.S. 417, 450–55 (1990).

## B.

Marriage, the Coalition argues, is an "institution directed to certain great social tasks, with many of those involving a man and a woman united in the begetting, rearing, and education of children"; it is being "torn away," they claim,

Respondent BLAG at 44–49, *Windsor*, 133 S. Ct. 2675 (No. 12-307), 2013 U.S. S. Ct. Briefs LEXIS 280 at *74–82.

"from its ancient social purposes and transformed into a government-endorsed celebration of the private desires of two adults (regardless of gender) to unite their lives sexually, emotionally, and socially for as long as those personal desires last." Defendants struggle, however, to identify any means by which same-sex marriages will undermine these social purposes. They argue vehemently that same-sex marriage will harm existing and especially future opposite-sex couples and their children because the message communicated by the social institution of marriage will be lost.

As one of the Nevada plaintiffs' experts testified, there is no empirical support for the idea that legalizing same-sex marriage would harm—or indeed, affect—opposite-sex marriages or relationships. That expert presented data from Massachusetts, a state which has permitted same-sex marriage since 2004, showing no decrease in marriage rates or increase in divorce rates in the past decade.[9] *See* Amicus Brief of Massachusetts et al. 23–27; *see also* Amicus Brief of American Psychological Association et al. 8–13. It would seem that allowing couples who want to marry so badly that they have endured years of litigation to win the right to do so would reaffirm the state's endorsement, without reservation, of spousal and parental commitment. From which aspect of same-sex marriages, then, will opposite-sex couples intuit the

---

[9] The Coalition takes issue with this conclusion, arguing that the effects of same-sex marriage might not manifest themselves for decades, because "something as massive and pervasive in our society and humanity as the man-woman marriage institution, like a massive ocean-going ship, does not stop or turn in a short space or a short time." Given that the discriminatory impact on individuals because of their sexual orientation is so harmful to them and their families, such unsupported speculation cannot justify the indefinite continuation of that discrimination.

destructive message defendants fear? Defendants offer only unpersuasive suggestions.

First, they argue that since same-sex families will not include both a father and a mother, a man who has a child with a woman will conclude that his involvement in that child's life is not essential. They appear to contend that such a father will see a child being raised by two women and deduce that because the state has said it is unnecessary for that child—who has two parents—to have a father, it is also unnecessary for *his* child to have a father. This proposition reflects a crass and callous view of parental love and the parental bond that is not worthy of response. We reject it out of hand. *Accord Kitchen*, 755 F.3d at 1223 (concluding that it was "wholly illogical" to think that same-sex marriage would affect opposite-sex couples' choices); *Windsor v. United States*, 699 F.3d 169, 188 (2d Cir. 2012); *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 998 (N.D. Cal. 2012); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 972 (N.D. Cal. 2010).

Defendants also propose another possible means by which endorsing same-sex marriage could discourage opposite-sex marriage, albeit less explicitly: opposite-sex couples who disapprove of same-sex marriage will opt less frequently or enthusiastically to participate in an institution that allows same-sex couples to participate. However, the fear that an established institution will be undermined due to private opposition to its inclusive shift is not a legitimate basis for retaining the status quo. In *United States v. Virginia*, the Court explained:

> The notion that admission of women would
> downgrade VMI's stature, destroy the

adversative system and, with it, even the
school, is a judgment hardly proved, a
prediction hardly different from other "self-
fulfilling prophec[ies]," *see Mississippi Univ.
for Women* [*v. Hogan*], 458 U.S. [718,] 730
[(1982)], once routinely used to deny rights or
opportunities.

. . .

A like fear, according to a 1925 report,
accounted for Columbia Law School's
resistance to women's admission, although
"[t]he faculty . . . never maintained that
women could not master legal learning[10]. . . .
No, its argument has been . . . more practical.
If women were admitted to the Columbia Law
School, [the faculty] said, then the choicer,
more manly and red-blooded graduates of our
great universities would go to the Harvard
Law School!" The Nation, Feb. 18, 1925, p.
173.

518 U.S. 515, 542–44 (1996); *see also Palmore v. Sidoti*,
466 U.S. 429, 433 (1984) ("The Constitution cannot control
such prejudices but neither can it tolerate them. Private biases
may be outside the reach of the law, but the law cannot,
directly or indirectly, give them effect."). The *Sevcik* district

---

[10] Likewise, Governor Otter assures us that Idaho's laws were not
motivated by judgments about the relative emotional commitments of
same-sex and opposite-sex couples; his argument is about an "ethos," he
claims, and so is not weakened by the fact that same-sex couples may, as
he admits, be just as child-oriented.

court thus erred in crediting the argument that "a meaningful percentage of heterosexual persons would cease to value the civil institution as highly as they previously had and hence enter it less frequently . . . because they no longer wish to be associated with the civil institution as redefined," both because defendants failed to produce any support for that prediction, and because private disapproval is a categorically inadequate justification for public injustice. *Sevcik*, 911 F. Supp. 2d at 1016.

Same-sex marriage, Governor Otter asserts, is part of a shift towards a consent-based, personal relationship model of marriage, which is more adult-centric and less child-centric.[11] The *Latta* district court was correct in concluding, however, that "marriage in Idaho is and has long been a designedly consent-based institution. . . . Idaho law is wholly indifferent to whether a heterosexual couple wants to marry because they share this vision" of conjugal marriage. *Latta*, 2014 WL 1909999, at *23.

Idaho focuses on another aspect of the procreative channeling claim. Because opposite-sex couples can accidentally conceive (and women may choose not to terminate unplanned pregnancies), so the argument goes, marriage is important because it serves to bind such couples together and to their children. This makes some sense. Defendants' argument runs off the rails, however, when they

---

[11] He also states, in conclusory fashion, that allowing same-sex marriage will lead opposite-sex couples to abuse alcohol and drugs, engage in extramarital affairs, take on demanding work schedules, and participate in time-consuming hobbies. We seriously doubt that allowing committed same-sex couples to settle down in legally recognized marriages will drive opposite-sex couples to sex, drugs, and rock-and-roll.

suggest that marriage's stabilizing and unifying force is unnecessary for same-sex couples, because they always choose to conceive or adopt a child.[12] As they themselves acknowledge, marriage not only brings a couple together at the initial moment of union; it helps to keep them together, "from [that] day forward, for better, for worse, for richer, for poorer, in sickness and in health." Raising children is hard; marriage supports same-sex couples in parenting their children, just as it does opposite-sex couples.

Moreover, marriage is not simply about procreation, but as much about

> expressions of emotional support and public commitment . . . . [M]any religions recognize marriage as having spiritual significance; . . .

---

[12] As Judge Richard Posner put it, bluntly:

> [These states] think[] that straight couples tend to be sexually irresponsible, producing unwanted children by the carload, and so must be pressured . . . to marry, but that gay couples, unable as they are to produce children wanted or unwanted, are model parents—model citizens really—so have no need for marriage. Heterosexuals get drunk and pregnant, producing unwanted children; their reward is to be allowed to marry. Homosexual couples do not produce unwanted children; their reward is to be denied the right to marry. Go figure.

*Baskin*, 2014 WL 4359059, at \*10 (7th Cir. Sept. 4, 2014).

Idaho and Nevada's laws are both over- and under-inclusive with respect to parental fitness. A man and a woman who have been convicted of abusing their children are allowed to marry; same-sex partners who have been adjudicated to be fit parents in an adoption proceeding are not.

> therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication . . . . [M]arital status often is a precondition to the receipt of government benefits (e. g., Social Security benefits), property rights (e. g., tenancy by the entirety, inheritance rights), and other, less tangible benefits (e. g., legitimation of children born out of wedlock).

*Turner v. Safley*, 482 U.S. 78, 95–96 (1987) (recognizing that prisoners, too, enjoyed the right to marry, even though they were not allowed to have sex, and even if they did not already have children).

Although many married couples have children, marriage is at its essence an "association that promotes . . . a bilateral loyalty, not commercial or social projects." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (recognizing that married couples have a privacy right to use contraception in order to prevent procreation). Just as "it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse," *Lawrence*, 539 U.S. at 567, it demeans married couples—especially those who are childless—to say that marriage is simply about the capacity to procreate.

Additionally, as plaintiffs argue persuasively, Idaho and Nevada's laws are grossly over- and under-inclusive with respect to procreative capacity. Both states give marriage licenses to many opposite-sex couples who cannot or will not reproduce—as Justice Scalia put it, in dissent, "the sterile and the elderly are allowed to marry," *Lawrence*, 539 U.S. at

604–05—but not to same-sex couples who already have children or are in the process of having or adopting them.[13]

A few of Idaho and Nevada's other laws, if altered, would directly increase the number of children raised by their married biological parents. We mention them to illustrate, by contrast, just how tenuous any potential connection between a ban on same-sex marriage and defendants' asserted aims is. For that reason alone, laws so poorly tailored as those before us cannot survive heightened scrutiny.

If defendants really wished to ensure that as many children as possible had *married* parents, they would do well to rescind the right to no-fault divorce, or to divorce altogether. Neither has done so. Such reforms might face constitutional difficulties of their own, but they would at least further the states' asserted interest in solidifying marriage. Likewise, if Idaho and Nevada want to increase the percentage of children being raised by their two *biological* parents, they might do better to ban assisted reproduction using donor sperm or eggs, gestational surrogacy, and adoption, by both opposite-sex and same-sex couples, as well as by single people. Neither state does. *See* Idaho Code §§ 39-5401 *et seq.*; Nev. Rev. Stat. §§ 122A.200(1)(d), 126.051(1)(a), 126.510 *et seq.*, 127.040; *see also* Carla Spivack, *The Law of Surrogate Motherhood in the United*

---

[13] Defendants acknowledge this, but argue that it would be unconstitutionally intrusive to determine procreative capacity or intent for opposite-sex couples, and that the states must therefore paint with a broad brush to ensure that any couple that could possibly procreate can marry. However, Idaho and Nevada grant the right to marry even to those whose inability to procreate is obvious, such as the elderly.

*States*, 58 Am. J. Comp. L. 97, 102 & n.15 (2010); *Idaho is a destination for surrogacy*, KTVB.com (Dec. 5, 2013).

In extending the benefits of marriage only to people who have the capacity to procreate, while denying those same benefits to people who already have children, Idaho and Nevada materially harm and demean same-sex couples and their children.[14] *Windsor*, 133 S. Ct. at 2694. Denying children resources and stigmatizing their families on this basis is "illogical and unjust." *Plyler v. Doe*, 457 U.S. 202, 220 (1982) (citation omitted). It is counterproductive, and it is unconstitutional.

## C.

Governor Otter and the Coalition, but not the state of Idaho, also argue that children should be raised by both a male parent and a female parent. They assert that their marriage laws have "recognized, valorized and made normative the roles of 'mother' and 'father' and their uniting, complementary roles in raising their offspring," and insist that allowing same-sex couples to marry would send the

---

[14] Idaho attempts to rebut testimony by the Idaho plaintiffs' expert that children of unmarried same-sex couples do just as well as those of married opposite-sex couples; the state mistakenly argues that this evidence shows that the children of same-sex couples are not harmed when the state withholds from their parents the right to marry. A more likely explanation for this expert's findings is that when same-sex couples raise children, whether adopted or conceived through the use of assisted reproductive technology, they have necessarily chosen to assume the financial, temporal, and emotional obligations of parenthood. This does not lead, however, to the conclusion that these children, too, would not benefit from their parents' marriage, just as children with opposite-sex parents do.

message that "men and women are interchangeable [and that a] child does not need a mother and a father."

However, as we explained in *SmithKline*, *Windsor* "forbid[s] state action from 'denoting the inferiority'" of same-sex couples. 740 F.3d at 482 (citing *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954)).

> It is the identification of such a class by the law for a separate and lesser public status that "make[s] them unequal." *Windsor*, 133 S. Ct. at 2694. DOMA was "practically a brand upon them, affixed by the law, an assertion of their inferiority." *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879). *Windsor* requires that classifications based on sexual orientation that impose inequality on gays and lesbians and send a message of second-class status be justified by some legitimate purpose.

*SmithKline*, 740 F.3d at 482. *Windsor* makes clear that the defendants' explicit desire to express a preference for opposite-sex couples over same-sex couples is a categorically inadequate justification for discrimination. Expressing such a preference is precisely what they *may not do.*

Defendants' argument is, fundamentally, non-responsive to plaintiffs' claims to *marriage* rights; instead, it is about the suitability of same-sex couples, married or not, as parents, adoptive or otherwise. That it is simply an ill-reasoned excuse for unconstitutional discrimination is evident from the fact that Idaho and Nevada already allow adoption by lesbians and gays. The Idaho Supreme Court has determined that "sexual orientation [is] wholly irrelevant" to a person's fitness or

ability to adopt children. *In re Adoption of Doe*, 326 P.3d 347, 353 (Idaho 2014). "In a state where the privilege of becoming a child's adoptive parent does not hinge on a person's sexual orientation, it is impossible to fathom how hypothetical concerns about the same person's parental fitness could possibly relate to civil marriage." *Latta*, 2014 WL 1909999, at \*23. By enacting a domestic partnership law, Nevada, too, has already acknowledged that no harm will come of treating same-sex couples the same as opposite-sex couples with regard to parenting. Nev. Rev. Stat. § 122A.200(1)(d) affords same-sex domestic partners parenting rights identical to those of married couples, including those related to adoption, custody and visitation, and child support. *See also St. Mary v. Damon*, 309 P.3d 1027, 1033 (Nev. 2013) (en banc) ("Both the Legislature and this court have acknowledged that, generally, a child's best interest is served by maintaining two actively involved parents. To that end, the Legislature has recognized that the children of same-sex domestic partners bear no lesser rights to the enjoyment and support of two parents than children born to married heterosexual parents.").

To allow same-sex couples to adopt children and then to label their families as second-class because the adoptive parents are of the same sex is cruel as well as unconstitutional. Classifying some families, and especially their children, as of lesser value should be repugnant to all those in this nation who profess to believe in "family values." In any event, Idaho and Nevada's asserted preference for opposite-sex parents does not, under heightened scrutiny, come close to justifying unequal treatment on the basis of sexual orientation.

Thus, we need not address the constitutional restraints the Supreme Court has long imposed on sex-role stereotyping, which may provide another potentially persuasive answer to defendants' theory. *See Virginia*, 518 U.S. at 533 (explaining that justifications which "rely on overbroad generalizations about the different talents, capacities, or preferences of males and females" are inadequate to survive heightened scrutiny); *see also Caban v. Mohammed*, 441 U.S. 380, 389 (1979) (rejecting the claim that "any universal difference between maternal and paternal relations at every phase of a child's development" justified sex-based distinctions in adoption laws). We note, in addition, that defendants have offered no probative evidence in support of their "complementarity" argument.

## IV.

Both the Idaho defendants and the Coalition advance a few additional justifications, though all are unpersuasive.[15] First, they argue that the population of each state is entitled to exercise its democratic will in regulating marriage as it sees fit. Each state "has an undeniable interest in ensuring that its rules of domestic relations reflect the widely held values of its people." *Zablocki v. Redhail*, 434 U.S. 374, 399 (1978) (Powell, J., concurring). True enough. But a primary purpose of the Constitution is to protect minorities from oppression by majorities. As *Windsor* itself made clear, "state laws defining

---

[15] None of the arguments advanced by other states in defense of their bans is any more persuasive. In particular, we agree with the Seventh Circuit that states may not "go slow" in extending to same-sex couples the right to marry; "it is sufficiently implausible that allowing same-sex marriage would cause palpable harm to family, society, or civilization to require the state to tender evidence justifying [if not proving] its fears; it has provided none." *Baskin*, 2014 WL 4359059, at *16–17.

and regulating marriage, of course, must respect the constitutional rights of persons." 133 S. Ct. at 2691 (citing *Loving v. Virginia*, 388 U.S. 1 (1967)). Thus, considerations of federalism cannot carry the day for defendants. They must instead rely on the substantive arguments that we find lacking herein.

Second, defendants argue that allowing same-sex couples to marry would threaten the religious liberty of institutions and people in Idaho and Nevada. Whether a Catholic hospital must provide the same health care benefits to its employees' same-sex spouses as it does their opposite-sex spouses, and whether a baker is civilly liable for refusing to make a cake for a same-sex wedding, turn on state public accommodations law, federal anti-discrimination law, and the protections of the First Amendment.[16] These questions are not before us. We merely note that avoiding the enforcement of anti-discrimination laws that "serv[e] compelling state interests of the highest order" cannot justify perpetuation of an otherwise

---

[16] *See, e.g.*, *Elane Photography, LLC v. Willock*, 284 P.3d 428 (N.M. 2012) (holding that a wedding photographer was liable for discrimination against a same-sex couple under state public accommodations law, and that this law did not violate the First Amendment), *cert. denied*, 134 S. Ct. 1787 (2014). Nevada law currently prohibits discrimination based on sexual orientation in public accommodations, while Idaho law does not. Nev. Rev. Stat. §§ 651.050(3), 651.070; Dan Popkey, *Idaho doesn't protect gays from discrimination, but Otter says that does not make the state anti-gay*, Idaho Statesman (Feb. 23, 2014).

We note also that an increasing number of religious denominations do sanctify same-sex marriages. Amicus Brief of Bishops of the Episcopal Church in Idaho et al. 8–9. Some religious organizations prohibit or discourage interfaith and interracial marriage, but it would obviously not be constitutional for a state to do so. Amicus Brief of the Anti-Defamation League et al. 23–25.

unconstitutionally discriminatory marriage regime. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (citation omitted).

Third, the Coalition argues that Nevada's ban is justified by the state's interest in protecting "the traditional institution of marriage."[17] Modern marriage regimes, however, have evolved considerably; within the past century, married women had no right to own property, enter into contracts, retain wages, make decisions about children, or pursue rape allegations against their husbands. *See generally* Claudia Zaher, *When A Woman's Marital Status Determined Her Legal Status: A Reserach Guide on the Common Law Doctrine of Coverture*, 94 Law Libr. J. 459, 460–61 (2002) *("*Under coverture, a wife simply had no legal existence. She became . . . 'civilly dead.'"). Women lost their citizenship when they married foreign men. *See* Kristin Collins, *When Father's Rights Are Mothers' Duties*, 109 Yale L.J. 1669, 1686–89 (2000). (In fact, women, married or not, were not allowed to serve on juries or even to vote. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 131–35 (1994).). Before no-fault divorce laws were enacted, separated spouses had to fabricate adulterous affairs in order to end their marriages. Lawrence M. Friedman, *A History of American Law* 577–78 (2005). As plaintiffs note, Nevada has been a veritable pioneer in changing these practices, enacting (and benefitting economically from) laws that made it among the easiest places in the country to get married and un-married. Both Idaho and Nevada's marriage regimes, as they exist today, bear little resemblance to those in place a century ago. As a result, defendants cannot credibly argue that their laws

---

[17] This argument was not advanced to this Court by the Idaho defendants.

protect a "traditional institution"; at most, they preserve the status quo with respect to one aspect of marriage—exclusion of same-sex couples.

Certainly, the exclusion of same-sex couples from marriage is longstanding. However, "it is circular reasoning, not analysis, to maintain that marriage must remain a heterosexual institution because that is what it historically has been." *Goodridge v. Dep't of Pub. Health*, 798 N.E. 2d 941, 961 n.23 (Mass. 2003). The anti-miscegenation laws struck down in *Loving* were longstanding. Here as there, however, "neither history nor tradition [can] save [the laws] from constitutional attack." *Lawrence*, 539 U.S. at 577–78 (quoting *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)).

## V.

Idaho and Nevada's marriage laws, by preventing same-sex couples from marrying and refusing to recognize same-sex marriages celebrated elsewhere,[18] impose profound legal, financial, social and psychic harms on numerous citizens of those states. These harms are not inflicted on opposite-sex couples, who may, if they wish, enjoy the rights and assume the responsibilities of marriage. Laws that treat people differently based on sexual orientation are unconstitutional unless a "legitimate purpose . . . overcome[s]" the injury

---

[18] Because we hold that Idaho and Nevada may not discriminate against same-sex couples in administering their own marriage laws, it follows that they may not discriminate with respect to marriages entered into elsewhere. Neither state advances, nor can we imagine, any different—much less more persuasive—justification for refusing to recognize same-sex marriages performed in other states or countries.

inflicted by the law on lesbians and gays and their families. *SmithKline*, 740 F.3d at 481–82.

Defendants' essential contention is that bans on same-sex marriage promote the welfare of children, by encouraging good parenting in stable opposite-sex families. Heightened scrutiny, however, demands more than speculation and conclusory assertions, especially when the assertions are of such little merit. Defendants have presented no evidence of any such effect. Indeed, they cannot even explain the manner in which, as they predict, children of opposite-sex couples will be harmed. Their other contentions are equally without merit. Because defendants have failed to demonstrate that these laws further any legitimate purpose, they unjustifiably discriminate on the basis of sexual orientation, and are in violation of the Equal Protection Clause.

The official message of support that Governor Otter and the Coalition wish to send in favor of opposite-sex marriage is equally unconstitutional, in that it necessarily serves to convey a message of disfavor towards same-sex couples and their families. This is a message that Idaho and Nevada simply may not send.

The lessons of our constitutional history are clear: inclusion strengthens, rather than weakens, our most important institutions. When we integrated our schools, education improved. *See Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 492–95 (1954). When we opened our juries to women, our democracy became more vital. *See Taylor v. Louisiana*, 419 U.S. 522, 535–37 (1975). When we allowed lesbian and gay soldiers to serve openly in uniform, it enhanced unit cohesion. *See Witt v. Dep't of Air Force*, 527 F.3d 806, 821 n.11 (9th Cir. 2008). When same-sex

couples are married, just as when opposite-sex couples are married, they serve as models of loving commitment to all.

The judgment of the district court in *Latta v. Otter* is **AFFIRMED**. The judgment of the district court in *Sevcik v. Sandoval* is **REVERSED**, and the case is **REMANDED** to the district court for the prompt issuance of an injunction permanently enjoining the state, its political subdivisions, and its officers, employees, and agents, from enforcing any constitutional provision, statute, regulation or policy preventing otherwise qualified same-sex couples from marrying, or denying recognition to marriages celebrated in other jurisdictions which, if the spouses were not of the same sex, would be valid under the laws of the state.

**AFFIRMED; REVERSED and REMANDED.**

REINHARDT, Circuit Judge, concurring:

I, of course, concur without reservation in the opinion of the Court. I write separately only to add that I would also hold that the fundamental right to marriage, repeatedly recognized by the Supreme Court, in cases such as *Loving v. Virginia*, 388 U.S. 1 (1967), *Zablocki v. Redhail*, 434 U.S. 374 (1978), and *Turner v. Safley*, 482 U.S. 78 (1987), is properly understood as including the right to marry an individual of one's choice. That right applies to same-sex marriage just as it does to opposite-sex marriage. As a result, I would hold that heightened scrutiny is appropriate for an additional reason: laws abridging fundamental rights are subject to strict scrutiny, and are invalid unless there is a "compelling state interest" which they are "narrowly tailored"

to serve. *United States v. Juvenile Male*, 670 F.3d 999, 1012 (9th Cir. 2012) (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)), *cert. denied*, 133 S. Ct. 234 (2012). Because the inadequacy of the states' justifications has been thoroughly addressed, I write only to explain my view that the same-sex marriage bans invalidated here also implicate plaintiffs' substantive due process rights.

Like all fundamental rights claims, this one turns on how we describe the right. Plaintiffs and defendants agree that there is a fundamental right to marry, but defendants insist that this right consists only of the right to marry an individual of the opposite sex. In *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997), the Supreme Court explained "that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." Our articulation of such fundamental rights must, we are told, be "carefully formulat[ed]." *Id.* at 722 (citations and quotation marks omitted).

However, "careful" does not mean "cramped." Our task is to determine the scope of the fundamental right to marry as inferred from the principles set forth by the Supreme Court in its prior cases. *Turner* held that prisoners who had no children and no conjugal visits during which to conceive them—people who could not be biological parents—had a due process right to marry. 482 U.S. at 94–97. *Zablocki* held that fathers with outstanding child support obligations—people who were, at least according to adjudications in family court, unable to adequately provide for existing children—had a due process right to marry. 434 U.S. at 383–87.

In each case, the Supreme Court referred to—and considered the historical roots of—the general right of people to marry, rather than a narrower right defined in terms of those who sought the ability to exercise it. These cases rejected status-based restrictions on marriage not by considering whether to recognize a new, narrow fundamental right (i.e., the right of prisoners to marry or the right of fathers with unpaid child support obligations to marry) or determining whether the class of people at issue enjoyed the right as it had previously been defined, but rather by deciding whether there existed a sufficiently compelling justification for depriving plaintiffs of the right they, as people, possessed.[1] *See id.* at 384 ("[D]ecisions of this Court confirm that the right to marry is of fundamental importance for all individuals.").

The third and oldest case in the fundamental right to marry trilogy, *Loving*, is also the most directly on point. That case held that Virginia's anti-miscegenation laws, which prohibited and penalized interracial marriages, violated the Fourteenth Amendment's Equal Protection and Due Process Clauses. 388 U.S. at 2–6. In a rhetorical stroke as uncomprehending as it is unavailing, defendants contend that lesbians and gays are not denied the freedom to marry by virtue of the denial of their right to marry individuals of the same sex, as they are still free to marry individuals of the

---

[1] *Turner* and *Zablocki* illustrate another important point, pertinent to the adequacy of defendants' justifications for curtailing the right. The first of these cases involved plaintiffs whom the state was entitled to prevent from procreating, and the second involved those who were unable to support existing offspring financially. If the fundamental right to marry extends to them, it certainly cannot be limited only to those who can procreate or to those who, in the eyes of the state, would form part of an ideal parenting unit.

opposite sex. Defendants assert that their same-sex marriage bans are unlike the laws in *Turner* and *Zablocki* because they do not categorically bar people with a particular characteristic from marrying, but rather limit whom lesbians and gays, and all other persons, may marry. However, *Loving* itself squarely rebuts this argument. Mildred Jeter and Richard Loving were not barred from marriage altogether. Jeter was perfectly free to marry a black person, and Loving was perfectly free to marry a white person. They were each denied the freedom, however, to marry the person whom they chose—the other. The case of lesbians and gays is indistinguishable. A limitation on the right to marry another person, whether on account of race or for any other reason, is a limitation on the right to marry.[2]

Defendants urge that "man-woman" and "genderless" marriage are mutually exclusive, and that permitting the latter will "likely destroy[]" the former. Quite the opposite is true. *Loving* teaches that Virginia's anti-miscegenation laws did not simply "deprive the Lovings of liberty without due process of law." 388 U.S. at 12. They did far worse; as the Court declared, the laws also "surely . . . deprive[d] *all the State's citizens* of liberty without due process of law." *Id.* (emphasis added). When Virginia told Virginians that they were not free to marry the one they loved if that person was

---

[2] Defendants are apparently concerned that if we recognize a fundamental right to marry the person of one's choice, this conclusion will necessarily lead to the invalidation of bans on incest, polygamy, and child marriage. However, fundamental rights may sometimes permissibly be abridged: when the laws at issue further compelling state interests, to which they are narrowly tailored. Although such claims are not before us, it is not difficult to envision that states could proffer substantially more compelling justifications for such laws than have been put forward in support of the same-sex marriage bans at issue here.

of a different race, it so grievously constrained their "freedom of choice to marry" that it violated the constitutional rights even of those citizens who did not themselves wish to enter interracial marriages or who were already married to a person of the same race. *Id.* When Idaho tells Idahoans or Nevada tells Nevadans that they are not free to marry the one they love if that person is of the same sex, it interferes with the universal right of *all the State's citizens*—whatever their sexual orientation—to "control their destiny." *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).

To define the right to marry narrowly, as the right to marry someone of the opposite sex, would be to make the same error committed by the majority in *Bowers v. Hardwick*, 478 U.S. 186, 190 (1986), which considered whether there was a "fundamental right to engage in homosexual sodomy." This description of the right at issue "fail[ed] to appreciate the extent of the liberty at stake," the Court stated in *Lawrence*, 539 U.S. at 567. *Lawrence* rejected as wrongheaded the question whether "homosexuals" have certain fundamental rights; "persons"—of whatever orientation—are rights-holders. *See id.* Fundamental rights defined with respect to the subset of people who hold them are fundamental rights misdefined. The question before us is not whether lesbians and gays have a fundamental right to marry a person of the same sex; it is whether a person has a fundamental right to marry, to enter into "the most important relation in life," *Maynard v. Hill*, 125 U.S. 190, 205 (1888), with the one he or she loves. Once the question is properly defined, the answer follows ineluctably: yes.

Historically, societies have strictly regulated intimacy and thereby oppressed those whose personal associations, such as committed same-sex relationships, were, though harmful to

no one, disfavored. Human intimacy, like "liberty[,] [has] manifold possibilities." *Lawrence*, 539 U.S. at 578. Although "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress[,] [a]s the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." *Id.* at 578–79.

We, as judges, deal so often with laws that confine and constrain. Yet our core legal instrument comprehends the rights of all people, regardless of sexual orientation, to love and to marry the individuals they choose. It demands not merely toleration; when a state is in the business of marriage, it must affirm the love and commitment of same-sex couples in equal measure. Recognizing that right dignifies them; in so doing, we dignify our Constitution.

BERZON, Circuit Judge, concurring:

I agree that Idaho and Nevada's same-sex marriage prohibitions fail because they discriminate on the basis of sexual orientation and I join in the Opinion of the Court. I write separately because I am persuaded that Idaho and Nevada's same-sex marriage bans are also unconstitutional for another reason: They are classifications on the basis of gender that do not survive the level of scrutiny applicable to such classifications.

## I.  The Same-Sex Marriage Prohibitions Facially Classify on the Basis of Gender

"[S]tatutory classifications that distinguish between males and females are 'subject to scrutiny under the Equal Protection Clause.'" *Craig v. Boren*, 429 U.S. 190, 197 (1976) (quoting *Reed v. Reed*, 404 U.S. 71, 75 (1971)). "To withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* "The burden of justification" the state shoulders under this intermediate level of scrutiny is "demanding": the state must convince the reviewing court that the law's "proffered justification" for the gender classification "is 'exceedingly persuasive.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). Idaho and Nevada's same-sex marriage bans discriminate on the basis of sex and so are invalid unless they meet this "demanding" standard.

**A.**  Idaho and Nevada's same-sex marriage prohibitions facially classify on the basis of sex.[1] Only women may marry men, and only men may marry women.[2] Susan Latta may not

---

[1] "Sex" and "gender" are not necessarily coextensive concepts; the meanings of these terms and the difference between them are highly contested. *See, e.g.*, Katherine Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex from Gender*, 144 U. Pa. L. Rev 1 (1995). For present purposes, I will use the terms "sex" and "gender" interchangeably, to denote the social and legal categorization of people into the generally recognized classes of "men" and "women."

[2] Idaho Const. art. III § 38 ("A marriage between a man and a woman is the only domestic legal union that shall be valid or recognized in this state."); Idaho Code § 32-201(1) ("Marriage is a personal relation arising

marry her partner Traci Ehlers for the sole reason that Latta is a woman; Latta could marry Ehlers if Latta were a man. Theodore Small may not marry his partner Antioco Carillo for the sole reason that Small is a man; Small could marry Carillo if Small were a woman. But for their gender, plaintiffs would be able to marry the partners of their choice. Their rights under the states' bans on same-sex marriage are wholly determined by their sex.

A law that facially dictates that a man may do X while a woman may not, or vice versa, constitutes, without more, a gender classification. "[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether [a policy] involves disparate treatment through explicit facial discrimination does not depend on why the [defendant] discriminates but rather on the explicit terms of the discrimination." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).[3] Thus, plaintiffs challenging policies that

---

out of a civil contract between a man and a woman . . . ."); Nev. Const. art. I, § 21 ("Only a marriage between a male and female person shall be recognized and given effect in this state."); Nev. Rev. Stat. § 122.020 ("[A] male and a female person . . . may be joined in marriage.").

[3] *UAW v. Johnson Controls* was a case brought under Title VII of the Civil Rights act of 1964, which, inter alia, bans employment policies that discriminate on the basis of sex. Title VII provides it is

> an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; (2) to limit, segregate, or classify his employees

facially discriminate on the basis of sex need not separately show either "intent" or "purpose" to discriminate. *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 277–78 (1979).

Some examples help to illuminate these fundamental precepts. Surely, a law providing that women may enter into business contracts only with other women would classify on the basis of gender. And that would be so whether or not men were similarly restricted to entering into business relationships only with other men.

---

. . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). The Supreme Court has "analog[ized]" to its decisions interpreting what constitutes discrimination "because of" a protected status under Title VII in analyzing Fourteenth Amendment equal protection claims and vice versa. *See, e.g.*, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 133 (1976), *superseded by statute on other grounds as recognized in Johnson Controls*, 499 U.S. at 219 ("While there is no necessary inference that Congress . . . intended to incorporate into Title VII the concepts of discrimination which have evolved from court decisions construing the Equal Protection Clause of the Fourteenth Amendment, the similarities between the congressional language and some of those decisions surely indicate that the latter are a useful starting point in interpreting the former."). As the Court has explained, "[p]articularly in the case of defining the term 'discrimination,'" Title VII must be interpreted consistently with Fourteenth Amendment equal protection principles, because Congress does not define "discrimination" in Title VII. *See Gilbert*, 429 U.S. at 133; *see also* 42 U.S.C. § 2000e. I therefore rely on Title VII cases throughout this Opinion for the limited purpose of determining whether a particular classification is or is not sex-based.

Likewise, a prison regulation that requires correctional officers be the same sex as the inmates in a prison "explicitly discriminates . . . on the basis of . . . sex." *Dothard v. Rawlinson*, 433 U.S. 321, 332, 332 n. 16 (1977). Again, that is so whether women alone are affected or whether men are similarly limited to serving only male prisoners.[4]

Further, it can make no difference to the existence of a sex-based classification whether the challenged law imposes gender homogeneity, as in the business partner example or *Dothard*, or gender heterogeneity. Either way, the *classification* is one that limits the affected individuals' opportunities based on their sex, as compared to the sex of the other people involved in the arrangement or transaction.

As Justice Johnson of the Vermont Supreme Court noted, the same-sex marriage prohibitions, if anything, classify *more* obviously on the basis of sex than they do on the basis of sexual orientation: "A woman is denied the right to marry another woman because her would-be partner is a woman, not because one or both are lesbians. . . . [S]exual orientation

---

[4] *Dothard* in fact dealt with a regulation that applied equally to men and women. *See* 433 U.S. at 332 n. 16 ("By its terms [the regulation at issue] applies to contact positions in both male and female institutions."); *see also id.* at 325 n. 6. *Dothard* ultimately upheld the sex-based discrimination at issue under Title VII's "bona fide occupational qualification" exception, 42 U.S.C. § 2000e-2(e), because of the especially violent, sexually charged nature of the particular prisons involved in that case, and because the regulation applied only to correctional officers in "contact positions" (i.e. working in close physical proximity to inmates) in maximum security institutions. *See Dothard*, 433 U.S. at 336–37 (internal quotation marks omitted). For present purposes, the salient holding is that the same-sex restriction *was* overtly a sex-based classification, even if it could be justified by a sufficiently strong BFOQ showing. *Id.* at 332–33.

does not appear as a qualification for marriage" under these laws; sex does. *Baker v. State*, 744 A.2d 864, 905 (Vt. 1999) (Johnson, J., concurring in part and dissenting in part).

The statutes' gender focus is also borne out by the experience of one of the Nevada plaintiff couples:

> When Karen Goody and Karen Vibe went to the Washoe County Marriage Bureau to obtain a marriage license, the security officer asked, "Do you have a man with you?" When Karen Vibe said they did not, and explained that she wished to marry Karen Goody, she was told she could not even obtain or complete a marriage license application . . . [because] "[t]wo women can't apply" . . . [and] marriage is "between a man and a woman."

Notably, Goody and Vibe were not asked about their sexual orientation; Vibe was told she was being excluded because of her gender and the gender of her partner.

Of course, the reason Vibe wants to marry Goody, one presumes, is due in part to their sexual orientations.[5] But that does not mean the classification at issue is not sex-based.

---

[5] The need for such a presumption, as to a factor that does not appear on the face of the same-sex marriage bans, suggests that the gender discrimination analysis is, if anything, a closer fit to the problem before us than the sexual orientation rubric. While the same-sex marriage prohibitions obviously operate to the disadvantage of the people likely to wish to marry someone of the same gender—i.e. lesbians, gay men, bisexuals, and otherwise-identified persons with same-sex attraction—the individuals' *actual* orientation is irrelevant to the application of the laws.

*Dothard* also involved a facial sex classification intertwined with presumptions about sexual orientation, in that instance heterosexuality. The Supreme Court in *Dothard* agreed that the state was justified in permitting only male officers to guard male inmates, because there was "a real risk that other inmates, deprived of a normal heterosexual environment, would assault women guards because they were women." 433 U.S. at 335. Thus, *Dothard*'s reasoning confirms the obvious: a statute that imposes a sex qualification, whether for a marriage license or a job application, is sex discrimination, pure and simple, even where assumptions about sexual orientation are also at play.

*Lawrence v. Texas*, 539 U.S. 558 (2003) also underscores why the continuation of the same-sex marriage prohibitions today is quite obviously about gender. *Lawrence* held that it violates due process for states to criminalize consensual, noncommercial same-sex sexual activity that occurs in private between two unrelated adults. *See id.* at 578. After *Lawrence*, then, the continuation of the same-sex marriage bans necessarily turns on the gender identity of the spouses, not the sexual activity they may engage in. To attempt to bar that activity would be unconstitutional. *See id.* The Nevada intervenors recognize as much, noting that *Lawrence* "differentiates between the fundamental right of gay men and lesbians to enter an intimate relationship, on one hand, and, on the other hand, the right to marry a member of one's own sex." The "right to marry a member of one's own sex" expressly turns on sex.

**B.** In concluding that these laws facially classify on the basis of gender, it is of no moment that the prohibitions "treat men as a class and women as a class equally" and in that

sense give preference to neither gender, as the defendants[6] fervently maintain. That argument revives the long-discredited reasoning of *Pace v. Alabama*, which upheld an anti-miscegenation statute on the ground that "[t]he punishment of each offending person, whether white or black, is the same." 106 U.S. 583, 585 (1883), *overruled by McLaughlin v. Florida*, 379 U.S. 184 (1964). *Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by Brown v. Board of Education*, 347 U.S. 483 (1954), similarly upheld racial segregation on the reasoning that segregation laws applied equally to black and white citizens.

This narrow view of the reach of the impermissible classification concept is, of course, no longer the law after *Brown*. *Loving v. Virginia* reinforced the post-*Brown* understanding of impermissible classification under the Fourteenth Amendment in a context directly analogous to the present one. Addressing the constitutionality of anti-miscegenation laws banning interracial marriage, *Loving* firmly "reject[ed] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discrimination." 388 U.S. 1, 8 (1967). As *Loving* explained, "an even-handed state purpose" can still be "repugnant to the Fourteenth Amendment," *id.* at 11 n. 11, because restricting individuals' rights, choices, or opportunities "solely because of racial classifications violates the central meaning of the Equal Protection Clause" even if members of all racial groups are

---

[6] Following the style of the Opinion of the Court, *see* Op. Ct. at 22 n. 4, I will refer throughout this Opinion to arguments advanced generally by "defendants," meaning the parties that continue actively to argue in defense of the laws, i.e. the Idaho defendants and the Nevada intervenors.

identically restricted with regard to interracial marriage. *Id.* at 12. "Judicial inquiry under the Equal Protection Clause . . . does not end with a showing of equal application among the members of the class defined by the legislation." *McLaughlin*, 379 U.S. 184 at 191.

If more is needed to confirm that the defendants' "equal application" theory has no force, there is more—cases decided both before and after *Loving*. *Shelley v. Kraemer*, for example, rejected the argument that racially restrictive covenants were constitutional because they would be enforced equally against both black and white buyers. *Shelley v. Kraemer* 334 U.S. 1, 21–22 (1948). In so holding, *Shelley* explained: "The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights." *Id.* at 22. *Shelley* also observed that "a city ordinance which denied to colored persons the right to occupy houses in blocks in which the greater number of houses were occupied by white persons, and imposed similar restrictions on white persons with respect to blocks in which the greater number of houses were occupied by colored persons" violated the Fourteenth Amendment despite its equal application to both black and white occupants. *See id.* at 11 (describing *Buchanan v. Warley*, 245 U.S. 60 (1917)).

The same individual rights analysis applies in the context of gender classifications. Holding unconstitutional peremptory strikes on the basis of gender, *J.E.B.* explained that "individual jurors themselves have a right to nondiscriminatory jury selection procedures . . . . [T]his right extends to both men and women." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140–41 (1994). "The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any

person,' reveals its concern with rights of individuals, not groups (though group disabilities are sometimes the mechanism by which the State violates the individual right in question)." *Id.* at 152 (Kennedy, J., concurring).

*City of Los Angeles, Dep't of Water & Power v. Manhart* further explains why, even in "the absence of a discriminatory effect on women as a class" or on men as a class, the same-sex marriage bars constitute gender classifications, because they "discriminate against *individual[s]* . . . because of their sex." 435 U.S. 702, 716 (1978) (emphasis added). In that case, the parties recognized that women, as a class, lived longer than men. *Id.* at 707–09. The defendant Department argued that this fact justified a policy that facially required all women to contribute larger monthly sums to their retirement plans than men, out of fairness to men as a class, who otherwise would subsidize women as a class. *Id.* at 708–09. *Manhart* rejected this justification for the sex distinction, explaining that the relevant focus must be "on fairness to individuals rather than fairness to classes," and held, accordingly, that the policy was unquestionably sex discriminatory. *Id.* at 709, 711.

Under all these precedents, it is simply irrelevant that the same-sex marriage prohibitions privilege neither gender as a whole or on average. Laws that strip *individuals* of their rights or restrict personal choices or opportunities solely on the basis of the individuals' gender are sex discriminatory and must be subjected to intermediate scrutiny. *See J.E.B.*, 511 U.S. at 140–42. Accordingly, I would hold that Idaho and Nevada's same-sex marriage prohibitions facially classify on the basis of gender, and that the "equal

application" of these laws to men and women as a class does not remove them from intermediate scrutiny.[7]

**C.**  The same-sex marriage prohibitions also constitute sex discrimination for the alternative reason that they impermissibly prescribe different treatment for similarly situated subgroups of men and women.  That is, the same-sex marriage laws treat the subgroup of men who wish to marry men less favorably than the otherwise similarly situated subgroup of women who want to marry men.  And the laws treat the subgroup of women who want to marry women less

---

[7] Several courts have so held.  *See Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n. 4 (N.D. Cal. 2012) ("Ms. Golinski is prohibited from marrying Ms. Cunninghis, a woman, because Ms. Golinski is a woman.  If Ms. Golinski were a man, DOMA would not serve to withhold benefits from her.  Thus, DOMA operates to restrict Ms. Golinski's access to federal benefits because of her sex."), *initial hearing en banc denied*, 680 F.3d 1104 (9th Cir. 2012) *and appeal dismissed*, 724 F.3d 1048 (9th Cir. 2013) ; *In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. EDR 2009) (Reinhardt, J., presiding) ("If [Levenson's husband] were female, or if Levenson himself were female, Levenson would be able to add [his husband] as a beneficiary. Thus, the denial of benefits at issue here was sex-based and can be understood as a violation of the . . . prohibition of sex discrimination."); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010) ("Perry is prohibited from marrying Stier, a woman, because Perry is a woman.  If Perry were a man, Proposition 8 would not prohibit the marriage. Thus, Proposition 8 operates to restrict Perry's choice of marital partner because of her sex."), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated and remanded sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *Baehr v. Lewin*, 852 P.2d 44, 59 (Haw. 1993) (plurality op.) (a same-sex marriage bar, "on its face, discriminates based on sex"); *Baker*, 744 A.2d at 905 (Johnson, J., concurring in part and dissenting in part) (a same-sex marriage bar presents "a straightforward case of sex discrimination" because it "establish[es] a classification based on sex").

favorably than the subgroup of otherwise identically situated men who want to marry women.

The Supreme Court has confirmed that such differential treatment of similarly-situated sex-defined subgroups also constitutes impermissible sex discrimination. *Phillips v. Martin Marietta Corp.*, for example, held that an employer's refusal to hire women with preschool-age children, while employing men with children the same age, was facial sex discrimination, even though all men, and all women without preschool-age children, were treated identically. *See* 400 U.S. 542, 543–44 (1971) (per curiam). And the Seventh Circuit held an airline's policy requiring female flight attendants, but not male flight attendants, to be unmarried was discrimination based on sex, relying on *Phillips* and explaining that a classification that affects only some members of one gender is still sex discrimination if similarly situated members of the other gender are not treated the same way. "The effect of the statute is not to be diluted because discrimination adversely affects only a portion of the protected class." *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971).

Of those individuals who seek to obtain the state-created benefits and obligations of legal marriage to a woman, men may do so but women may not. Thus, at the subclass level—the level that takes into account the similar situations of affected individuals—women as a group and men as a group *are* treated differently. For this reason as well I would hold that Idaho and Nevada's same-sex marriage prohibitions facially classify on the basis of gender. They must be reviewed under intermediate scrutiny.

**D.** One further point bears mention. The defendants note that the Supreme Court summarily rejected an equal protection challenge to a same-sex marriage bar in *Baker v. Nelson*, 409 U.S. 810 (1972), holding there was no substantial federal question presented in that case. But the Court did not clarify that sex-based classifications receive intermediate scrutiny until 1976. *See Craig*, 429 U.S. at 221, 218 (Rehnquist, J., dissenting) (describing the level of review prescribed by the majority as "new," and as "an elevated or 'intermediate' level scrutiny"). As this fundamental doctrinal change postdates *Baker*, *Baker* is no longer binding as to the sex discrimination analysis, just as it is no longer binding as to the sexual orientation discrimination analysis. *See* Op. Ct. at 22–24.

## II. Same-Sex Marriage Bars Are Based in Gender Stereotypes

Idaho and Nevada's same sex marriage laws not only classify on the basis of sex but also, implicitly and explicitly, draw on "archaic and stereotypic notions" about the purportedly distinctive roles and abilities of men and women. Eradicating the legal impact of such stereotypes has been a central concern of constitutional sex-discrimination jurisprudence for the last several decades. *See, e.g.*, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982). The same-sex marriage bans thus share a key characteristic with many other sex-based classifications, one that underlay the Court's adoption of intermediate scrutiny for such classifications.

The Supreme Court has consistently emphasized that "gender-based classifications . . . may be reflective of 'archaic and overbroad' generalizations about gender, or

based on 'outdated misconceptions concerning the role of females in the home rather than in the marketplace and world of ideas.'" *J.E.B.*, 511 U.S. at 135 (quoting *Schlesinger v. Ballard*, 419 U.S. 498, 506–07 (1975); *Craig*, 429 U.S. at 198–99) (some internal quotation marks omitted). Laws that rest on nothing more than "the 'baggage of sexual stereotypes,' that presume[] the father has the 'primary responsibility to provide a home and its essentials,' while the mother is the 'center of home and family life'" have been declared constitutionally invalid time after time. *Califano v. Westcott*, 443 U.S. 76, 89 (1979) (quoting *Orr v. Orr*, 440 U.S. 268, 283 (1979); *Stanton v. Stanton*, 421 U.S. 7, 10 (1975); *Taylor v. Louisiana*, 419 U.S. 522 (1975)). Moreover, "gender classifications that rest on impermissible stereotypes violate the Equal Protection Clause, even when some statistical support can be conjured up for the generalization." *J.E.B.*, 511 U.S. at 139 n. 11. And hostility toward nonconformance with gender stereotypes also constitutes impermissible gender discrimination. *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *accord Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874 (9th Cir. 2001) (harassment against a person for "failure to conform to [sex] stereotypes" is gender-based discrimination) (internal quotation marks omitted).

The notion underlying the Supreme Court's anti-stereotyping doctrine in both Fourteenth Amendment and Title VII cases is simple, but compelling: "[n]obody should be forced into a predetermined role on account of sex," or punished for failing to conform to prescriptive expectations of what behavior is appropriate for one's gender. *See* Ruth Bader Ginsburg, *Gender and the Constitution*, 44 U. Cin. L. Rev. 1, 1 (1975). In other words, laws that give effect to "pervasive sex-role stereotype[s]" about the behavior

appropriate for men and women are damaging because they restrict individual choices by punishing those men and women who do not fit the stereotyped mold. *Nev. Dep't of Human Resources v. Hibbs*, 538 U.S. 721, 731, 738 (2003).

Idaho and Nevada's same-sex marriage prohibitions, as the justifications advanced for those prohibitions in this Court demonstrate, patently draw on "archaic and stereotypic notions" about gender. *Hogan*, 458 U.S. at 725. These prohibitions, the defendants have emphatically argued, communicate the state's view of what is both "normal" and preferable with regard to the romantic preferences, relationship roles, and parenting capacities of men and women. By doing so, the laws enforce the state's view that men and women "naturally" behave differently from one another in marriage and as parents.

The defendants, for example, assert that "gender diversity or complementarity among parents . . . provides important benefits" to children, because "mothers and fathers tend on average to parent differently and thus make unique contributions to the child's overall development." The defendants similarly assert that "[t]he man-woman meaning at the core of the marriage institution, reinforced by the law, has always recognized, valorized, and made normative the roles of 'mother' and 'father' and their uniting, complementary roles in raising their offspring."

Viewed through the prism of the Supreme Court's contemporary anti-stereotyping sex discrimination doctrine, these proferred justifications simply underscore that the same-sex marriage prohibitions discriminate on the basis of sex, not only in their form—which, as I have said, is sufficient in itself—but also in reviving the very infirmities

that led the Supreme Court to adopt an intermediate scrutiny standard for sex classifications in the first place. I so conclude for two, somewhat independent, reasons.

**A.** First, and more obviously, the gender stereotyping at the core of the same-sex marriage prohibitions clarifies that those laws affect men and women in basically the same way as, not in a fundamentally different manner from, a wide range of laws and policies that have been viewed consistently as discrimination based on sex. As has been repeated again and again, legislating on the basis of such stereotypes limits, and is meant to limit, the choices men and women make about the trajectory of their own lives, choices about work, parenting, dress, driving—and yes, marriage. This focus in modern sex discrimination law on the preservation of the ability freely to make individual life choices regardless of one's sex confirms that sex discrimination operates at, and must be justified at, the level of individuals, not at the broad class level of all men and women. Because the same-sex marriage prohibitions restrict individuals' choices on the basis of sex, they discriminate based on sex for purposes of constitutional analysis precisely to the same degree as other statutes that infringe on such choices—whether by distributing benefits or by restricting behavior—on that same ground.

**B.** Second, the long line of cases since 1971 invalidating various laws and policies that categorized by sex have been part of a transformation that has altered the very institution at the heart of this case, marriage. Reviewing that transformation, including the role played by constitutional sex discrimination challenges in bringing it about, reveals that the same sex marriage prohibitions seek to preserve an outmoded, sex-role-based vision of the marriage institution,

and in that sense as well raise the very concerns that gave rise to the contemporary constitutional approach to sex discrimination.

**(i)** Historically, marriage was a profoundly unequal institution, one that imposed distinctly different rights and obligations on men and women. The law of coverture, for example, deemed the "the husband and wife . . . one person," such that "the very being or legal existence of the woman [was] suspended . . . or at least [was] incorporated and consolidated into that of the husband" during the marriage. 1 William Blackstone, Commentaries on the Laws of England 441 (3d rev. ed. 1884). Under the principles of coverture, "a married woman [was] incapable, without her husband's consent, of making contracts . . . binding on her or him." *Bradwell v. Illinois*, 83 U.S. 130, 141 (1872) (Bradley, J., concurring). She could not sue or be sued without her husband's consent. *See, e.g.*, Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 11–12 (2000). Married women also could not serve as the legal guardians of their children. *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (plurality op.).

Marriage laws further dictated economically disparate roles for husband and wife. In many respects, the marital contract was primarily understood as an economic arrangement between spouses, whether or not the couple had or would have children. "Coverture expressed the legal essence of marriage as reciprocal: a husband was bound to support his wife, and in exchange she gave over her property and labor." Cott, *Public Vows*, at 54. That is why "married women traditionally were denied the legal capacity to hold or convey property . . . ." *Frontiero*, 411 U.S. at 685. Notably, husbands owed their wives support even if there were no

children of the marriage. *See, e.g.*, Hendrik Hartog, *Man and Wife in America: A History* 156 (2000).

There was also a significant disparity between the rights of husbands and wives with regard to physical intimacy. At common law, "a woman was the sexual property of her husband; that is, she had a duty to have intercourse with him." John D'Emilio & Estelle B. Freedman, *Intimate Matters: A History of Sexuality in America* 79 (3d ed. 2012). Quite literally, a wife was legally "the possession of her husband, . . . [her] husband's property." Hartog, *Man and Wife in America*, at 137. Accordingly, a husband could sue his wife's lover in tort for "entic[ing]" her or "alienat[ing]" her affections and thereby interfering with his property rights in her body and her labor. *Id.* A husband's possessory interest in his wife was undoubtedly also driven by the fact that, historically, marriage was the only legal site for licit sex; sex outside of marriage was almost universally criminalized. *See, e.g.*, Ariela R. Dubler, *Immoral Purposes: Marriage and the Genus of Illicit Sex*, 115 Yale L.J. 756, 763–64 (2006).

Notably, although sex was strongly presumed to be an essential part of marriage, the ability to procreate was generally not. *See, e.g.*, Chester Vernier, American Family Laws: A Comparative Study of the Family Law of the Forty-Eight American States, Alaska, the District of Columbia, and Hawaii (to Jan. 1, 1931) (1931) I § 50, 239–46 (at time of survey, grounds for annulment typically included impotency, as well as incapacity due to minority or "non-age"; lack of understanding and insanity; force or duress; fraud; disease; and incest; but not inability to conceive); II § 68, at 38–39 (1932) (at time of survey, grounds for divorce included "impotence"; vast majority of states "generally held that impotence . . . does not mean sterility but must be of such a

nature as to render complete sexual intercourse practically impossible"; and only Pennsylvania "ma[d]e sterility a cause" for divorce).

The common law also dictated that it was legally impossible for a man to rape his wife. Men could not be prosecuted for spousal rape. A husband's "incapacity" to rape his wife was justified by the theory that "'the marriage constitute[d] a blanket consent to sexual intimacy which the woman [could] revoke only by dissolving the marital relationship.'" *See, e.g.*, Jill Elaine Hasday, *Contest and Consent: A Legal History of Marital Rape*, 88 Calif. L. Rev 1373, 1376 n. 9 (2000) (quoting Model Penal Code and Commentaries, § 213.1 cmt. 8(c), at 342 (Official Draft and Revised Comments 1980)).

Concomitantly, dissolving the marital partnership via divorce was exceedingly difficult. Through the mid-twentieth century, divorce could be obtained only on a limited set of grounds, if at all. At the beginning of our nation's history, several states did not permit full divorce except under the narrowest of circumstances; separation alone was the remedy, even if a woman could show "cruelty endangering life or limb." Peter W. Bardaglio, *Reconstrucing the Household: Families, Sex, and the Law in the Nineteenth-Century South* 33 (1995); *see also id.* 32–33. In part, this policy dovetailed with the grim fact that, at English common law, and in several states through the beginning of the nineteenth century, "a husband's prerogative to chastise his wife"—that is, to beat her short of permanent injury—was recognized as his marital right. Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2125 (1996).

Perhaps unsurprisingly, the profoundly unequal status of men and women in marriage was frequently cited as justification for denying women equal rights in other arenas, including the workplace. "[S]tate courts made clear that the basis, and validity, of such laws lay in stereotypical beliefs about the appropriate roles of men and women." *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 864 (9th Cir. 2001), *aff'd sub nom. Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721. Justice Bradley infamously opined in 1887 that "the civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman." *Bradwell*, 83 U.S. at 141 (Bradley, J., concurring). On this view, women could be excluded from various professions because "[t]he natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life." *Id.* Instead, the law gave effect to the belief that "[t]he paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother." *Id.*

As a result of this separate-spheres regime, "'[h]istorically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second.' . . . Stereotypes about women's domestic roles [we]re reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men." *Hibbs*, 538 U.S. at 736 (quoting the Joint Hearing before the Subcommittee on Labor–Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., at 100 (1986)). Likewise, social benefits programs historically distinguished between men and women on the assumption, grounded in the unequal marital status of men and women, that women were more likely to be

homemakers, supported by their working husbands. *See, e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 205–07 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 644–45 (1975).

**(ii)** This asymmetrical regime began to unravel slowly in the nineteenth century, starting with the advent of Married Women's Property Acts, which allowed women to possess property in their own right for the first time. *See, e.g.*, Reva B. Siegel, *The Modernization of Marital Status Law: Adjudicating Wives' Rights to Earnings, 1860–1930*, 82 Geo. L. Rev. 2127(1994). Eventually, state legislatures revised their laws. Today, of course, a married woman may enter contracts, sue and be sued without her husband's participation, and own and convey property. The advent of "no fault" divorce regimes in the late 1960s and early 1970s made marital dissolutions more common, and legislatures also directed family courts to impose child and spousal support obligations on divorcing couples without regard to gender. *See* Cott, *Public Vows*, at 205–06. As these legislative reforms were taking hold, "in 1971 . . . the Court f[ou]nd for the first time that a state law violated the Equal Protection Clause because it arbitrarily discriminated on the basis of sex." *Hibbs*, 273 F.3d at 865 (citing *Reed*, 404 U.S. 71).

This same legal transformation extended into the marital (and nonmarital) bedroom. Spousal rape has been criminalized in all states since 1993. *See, e.g.*, Sarah M. Harless, *From the Bedroom to the Courtroom: The Impact of Domestic Violence Law on Marital Rape Victims*, 35 Rutgers L.J. 305, 318 (2003). *Griswold v. Connecticut*, 381 U.S. 479 (1965), held that married couples have a fundamental privacy right to use contraceptives, and *Eisenstadt v. Baird*, 405 U.S. 438 (1972), later applied equal protection principles to extend

this right to single persons.   More recently, *Lawrence* clarified that licit, consensual sexual behavior is no longer confined to marriage, but is protected when it occurs, in private, between two consenting adults, regardless of their gender. *See* 539 U.S. at 578.

In the child custody context, mothers and fathers today are generally presumed to be equally fit parents. *See, e.g.*, Cott, *Public Vows*, at 206. *Stanley v. Illinois*, 405 U.S. 645, 658 (1972), for example, held invalid as an equal protection violation a state law that presumed unmarried fathers, but not unwed mothers, unfit as parents. Later, the Supreme Court expressly "reject[ed] . . . the claim that . . . [there is] any universal difference between maternal and paternal relations at every phase of a child's development." *Caban v. Mohammed*, 441 U.S. 380, 389 (1979). Likewise, both spouses in a marriage are now entitled to economic support without regard to gender. *See* Cott, at 206–07. Once again, equal protection adjudication contributed to this change: *Orr*, 440 U.S. at 278–79, struck down a state statutory scheme imposing alimony obligations on husbands but not wives.

In short, a combination of constitutional sex-discrimination adjudication, legislative changes, and social and cultural transformation has, in a sense, already rendered contemporary marriage "genderless," to use the phrase favored by the defendants. *See* Op. Ct. at 25 n. 6. For, as a result of these transformative social, legislative, and doctrinal developments, "[g]ender no longer forms an essential part of marriage; marriage under law is a union of equals." *Perry*, 704 F. Supp. 2d at 993. As a result, in the states that currently ban same-sex marriage, the legal norms that currently govern the institution of marriage are "genderless" in every resepect *except* the requirement that would-be

spouses be of different genders. With that exception, Idaho and Nevada's marriage regimes have jettisoned the rigid roles marriage as an institution once prescribed for men and women. In sum, "the sex-based classification contained in the[se] marriage laws," as the *only* gender classification that persists in some states' marriage statutes, is, at best, "a vestige of sex-role stereotyping" that long plagued marital regimes before the modern era, *see Baker*, 744 A.2d at 906 (Johnson, J., concurring in part and dissenting in part), and, at worst, an attempt to reintroduce gender roles.

The same-sex marriage bars constitute gender discrimination both facially and when recognized, in their historical context, both as resting on sex stereotyping and as a vestige of the sex-based legal rules once imbedded in the institution of marriage. They must be subject to intermediate scrutiny.

### III.    Idaho and Nevada's Same-Sex Marriage Prohibitions Fail Under Intermediate Scrutiny

For Idaho and Nevada's same-sex marriage prohibitions to survive the intermediate scrutiny applicable to sex discriminatory laws, it must be shown that these laws "serve important governmental objectives and [are] substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197. "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Hogan*, 458 U.S. at 725–26.

In part, the interests advanced by the defendants fail because they are interests in promoting and enforcing gender stereotyping and so simply are not legitimate governmental interests. And even if we assume that the other governmental objectives cited by the defendants are legitimate and important, the defendants have not shown that the same-sex marriage prohibitions are substantially related to achieving any of them.

The asserted interests fall into roughly three categories: (1) ensuring children are raised by parents who provide them with the purported benefits of "gender complementarity," also referred to as "gender diversity"; (2) "furthering the stability of family structures through benefits targeted at couples possessing biological procreative capacity," and/or discouraging "motherlessness" or "fatherlessness in the home"; and (3) promoting a "child-centric" rather than "adult-centric" model of marriage."[8] The defendants insist that "genderless marriage run[s] counter to . . . [these] norms and ideals," which is why "man-woman marriage" must be preserved.

---

[8] The defendants also assert that the state has an interest in "accommodating religious freedom and reducing the potential for civic strife." But, as the Opinion of the Court notes, even if allowing same-sex marriage were likely to lead to religious strife, which is highly doubtful, to say the least, that fact would not justify the denial of equal protection inherent in the gender-based classification of the same-sex marriage bars. *See Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) (rejecting the city's proffered justification that delay in desegregating park facilities was necessary to avoid interracial "turmoil," and explaining "constitutional rights may not be denied simply because of hostility to their assertion or exercise").

The Opinion of the Court thoroughly demonstrates why all of these interests are without merit as justifications for sexual orientation discrimination.  I add this brief analysis only to show that the justifications are likewise wholly insufficient under intermediate scrutiny to support the sex-based classifications at the core of these laws.

**A.**  The Idaho defendants assert that the state has an interest in ensuring children have the benefit of parental "gender complementarity."  There must be "space in the law for the distinct role of 'mother' [and] the distinct role of 'father' and therefore of their united, complementary role in raising offspring," the Idaho defendants insist.  On a slightly different tack, the Nevada intervenors similarly opine that "[s]ociety has long recognized that diversity in education brings a host of benefits to students," and ask, "[i]f that is true in education, why not in parenting?"

Under the constitutional sex-discrimination jurisprudence of the last forty years, neither of these purported justifications can possibly pass muster as a justification for sex discrimination.  Indeed, these justifications are laden with the very "'baggage of sexual stereotypes'" the Supreme Court has repeatedly disavowed.  *Califano v. Westcott*, 443 U.S. at 89 (quoting *Orr*, 440 U.S. at 283).

**(i)**  It should be obvious that the stereotypic notion "that the two sexes bring different talents to the parenting enterprise," runs directly afoul of the Supreme Court's repeated disapproval of "generalizations about 'the way women are,'" *VMI*, 518 U.S. at 550, or "the way men are," as a basis for legislation.  Just as *Orr*, 440 U.S. at 279–80, rejected gender-disparate alimony statutes "as effectively announcing the State's preference for an allocation of family

responsibilities under which the wife plays a dependent role," so a state preference for supposed gender-specific parenting styles cannot serve as a legitimate reason for a sex-based classification.

This conclusion would follow "[e]ven [if] some statistical support can be conjured up for the generalization" that men and women behave differently as marital partners and/or parents, because laws that rely on gendered stereotypes about how men and women behave (or should behave) must be reviewed under intermediate scrutiny. *See J.E.B.*, 511 U.S. at 140. It has even greater force where, as here, the supposed difference in parenting styles lacks reliable empirical support, even "on average."[9] Communicating such archaic gender-role stereotypes to children, or to parents and potential parents, is not a legitimate governmental interest, much less a substantial one.

**(ii)** The assertion that preserving "man-woman marriage" is permissible because the state has a substantial interest in promoting "diversity" has no more merit than the "gender complementarity" justification. Diversity is assuredly a weighty interest in the context of public educational institutions, with hundreds or thousands of individuals. But "[t]he goal of community diversity has no place . . . as a requirement of marriage," which, by law, is a private institution consisting only of two persons. *Baker v. State*, 744 A.2d at 910 (Johnson, J., concurring in part and dissenting in part). "To begin with, carried to its logical

---

[9] As one of the plaintiffs' expert psychologists, Dr. Michael Lamb, explained, "[t]here . . . is no empirical support for the notion that the presence of both male and female role models in the home enhances the adjustment of children and adolescents."

conclusion, the [Nevada intervenors'] rationale could require all marriages to be between [two partners], not just of the opposite sex, but of different races, religions, national origins, and so forth, to promote diversity." *Id.* Such an absurd requirement would obviously be unconstitutional. *See Loving*, 388 U.S. 1.

Moreover, even if it were true that, on average, women and men have different perspectives on some issues because of different life experiences, individual couples are at least as likely to exhibit conformity as diversity of personal characteristics. Sociological research suggests that individual married couples are more likely to be *similar* to each other in terms of political ideology, educational background, and economic background than they are to be dissimilar; despite the common saying that "opposites attract," in actuality it appears that "like attracts like." *See, e.g.*, John R. Alford et al., *The Politics of Mate Choice*, 73:2 J. Politics 362, 376 (2011) ("[S]pousal concordance in the realm of social and political attitudes is extremely high."); Jeremy Greenwood et al., *Marry Your Like: Assortative Mating and Income Inequality* (Population Studies Ctr., Univ. Of Penn., Working Paper No. 14-1, at 1, 2014) (Since the 1960s, "the degree of assortative mating [with regard to educational level] has increased."). Further, there is no evidence of which I am aware that gender is a better predictor of diversity of viewpoints or of parenting styles than other characteristics. Such "gross generalizations that would be deemed impermissible if made on the basis of race [do not become] somehow permissible when made on the basis of gender." *J.E.B.*, 511 U.S. at 139–40.

In short, the defendants' asserted state interests in "gender complementarity" and "gender diversity" are not legitimate

"important governmental objectives." *See Craig*, 429 U.S. at 197. Accordingly, I do not address whether excluding same-sex couples from marriage is substantially related to this goal.

**B.** The defendants also argue that their states have an important interest in "encouraging marriage between opposite-sex partners" who have biological children, so that those children are raised in an intact marriage rather than in a cohabiting or single-parent household. Assuming that this purpose is in fact a "important governmental objective," the defendants have entirely failed to explain how excluding same-sex couples from marriage is substantially related to achieving the objective of furthering family stability.

**(i)** I will interpret the asserted state goal in preventing "fatherlessness" and "motherlessness" broadly. That is, I shall assume that the states want to discourage parents from abandoning their children by encouraging dual parenting over single parenting. If the asserted purpose were instead read narrowly, as an interest in ensuring that a child has both a mother and a father in the home (rather than two mothers or two fathers), the justification would amount to the same justification as the asserted interest in "gender complementarity," and would fail for the same reason. That is, the narrower version of the family stability justification rests on impermissible gender stereotypes about the relative capacities of men and women.

Discouraging single parenting by excluding same-sex couples from marriage is oxymoronic, in the sense that it will likely achieve exactly the opposite of what the states say they seek to accomplish. The defendants' own evidence suggests that excluding same-sex couples from marriage renders their

unions less stable, increasing the risk that the children of those couples will be raised by one parent rather than two.

True, an increasing number of children are now born and raised outside of marriage, a development that may well be undesirable.[10]  But that trend began apace well before the advent of same-sex marriage and has been driven by entirely different social and legal developments.  The trend can be traced to declines in marriage rates, as well as to the rise in divorce rates after the enactment of "no fault" divorce regimes in the late 1960s and early 1970s.  "The proportion of adults who declined to marry at all rose substantially between 1972 and 1998 . . . . [In the same period,] [t]he divorce rate rose more furiously, to equal more than half the marriage rate, portending that at least one in two marriages would end in divorce."  Cott, *Public Vows*, at 203.  The defendants' assertion that excluding same-sex couples from marriage will do anything to reverse these trends is utterly unsubstantiated.

**(ii)**   The defendants' appeal to biology is similarly without merit.  Their core assertion is that the states have a substantial interest in channeling opposite-sex couples into marriage, so that any accidentally produced children are more likely to be raised in a two-parent household.   But the exclusion of same-sex couples from the benefits and obligations of state-sanctioned marriage is assuredly not

---

[10] According to the defendants, "[b]etween 1970 and 2005, the proportion of children living with two married parents dropped from 85 percent to 68 percent," and as of 2008, "[m]ore than a third of all U.S. children [were] . . . born outside of wedlock."  *See*  Benjamin Scafidi, Institute for American Values, *The Taxpayer Costs of Divorce and Unwed Childbearing: First-Ever Estimates for the Nation and All Fifty States* 7 (2008).

"substantially related," *Craig*, 429 U.S. at 197, to achieving that goal.

The reason only opposite-sex couples should be allowed to marry, we are told by the defendants, is that they "possess the unique ability to create new life." But both same-sex and opposite-sex couples can and do produce children biologically related only to one member of the couple, via assisted reproductive technology or otherwise. And both same-sex and opposite-sex couples adopt children, belying the notion that the two groups necessarily differ as to their biological connection to the children they rear.

More importantly, the defendants "cannot explain how the failure of *opposite-sex* couples to accept responsibility for the children they create relates at all to the exclusion of same-sex couples from the benefits of marriage." *Baker*, 744 A.2d at 911 (Johnson, J., concurring in part and dissenting in part). For one thing, marriage has never been restricted to opposite-sex couples able to procreate; as noted earlier, the spousal relationship, economic and otherwise, has always been understood as a sufficient basis for state approval and regulation. *See supra* pp. 65–68. For another, to justify sex discrimination, the state must explain why the *discriminatory feature* is closely related to the state interest. *See Hogan*, 458 U.S. at 725–26. The states thus would have to explain, without reliance on sex-stereotypical notions, why the bans on same-sex marriage advance their interests in inducing more biological parents to marry each other. No such showing has been or can be made.

Biological parents' inducements to marry will remain exactly what they have always been if same-sex couples can marry. The legal benefits of marriage—taxation, spousal

support, inheritance rights, familial rights to make decisions concerning the illness and death of a spouse, and so on—will not change. *See, e.g.*, *Turner v. Safley*, 482 U.S. 78, 95–96 (1987). The only change will be that now-excluded couples will enjoy the same rights. As the sex-based exclusion of same-sex couples from marrying does not in any way enhance the marriage benefits available to opposite-sex couples, that exclusion does not substantially advance—or advance at all—the state interest in inducing opposite-sex couples to raise their biological children within a stable marriage.

**(iii)** Finally, the defendants argue that "the traditional marriage institution" or "man-woman marriage . . . is relatively but decidedly more child-centric" than "genderless marriage," which they insist is "relatively but decidedly more adult-centric."

These assertions are belied by history. As I have noted, *see supra* pp. 65–71, "traditional marriage" was in fact quite "adult-centric." Marriage was, above all, an economic arrangement between spouses. *See, e.g.*, Cott, *Public Vows*, at 54. Whether or not there were children, the law imposed support obligations, inheritance rules, and other rights and burdens upon married men and women. Moreover, couples unwilling or unable to procreate have never been prevented from marrying. Nor was infertility generally recognized as a ground for divorce or annulment under the old fault-based regime, even though sexual impotence was. *See, e.g.*, Vernier, I §50, II § 68.

Further, the social concept of "companionate marriage"—that is, legal marriage for companionship purposes without the possibility of children—has existed

since at least the 1920s. *See* Christina Simmons, *Making Marriage Modern: Women's Sexuality from the Progressive Era to World War II* 121 (2009). The Supreme Court called on this concept when it recognized the right of married couples to use contraception in 1965. *Griswold*, 381 U.S. at 486. *Griswold* reasoned that, with or without procreation, marriage was "an association for as noble a purpose as any." *Id.*

Same-sex marriage is thus not inherently less "child-centric" than "traditional marriage."[11] In both versions, the couple may bear or adopt and raise children, or not.

Finally, a related notion the defendants advance, that allowing same-sex marriage will render the marriage institution "genderless," in the sense that gender roles within opposite-sex marriages will be altered, is also ahistorical. As I have explained, those roles have already been profoundly altered by social, legislative, and adjudicative changes. All these changes were adopted toward the end of eliminating the gender-role impositions that previously inhered in the legal regulation of marriage.

In short, the "child-centric"/"adult-centric" distinction is an entirely ephemeral one, at odds with the current realities of marriage as an institution. There is simply no substantial

---

[11] Moreover, if the assertion that same-sex marriages are more "adult-centric" is meant to imply state disapproval of the sexual activity presumed to occur in same-sex marriages, that disapproval could not be a legitimate state purpose. After *Lawrence*, the right to engage in same-sex sexual activity is recognized as a protected liberty interest. *See* 539 U.S. at 578.

relationship between discouraging an "adult-centric" model
of marriage and excluding same-sex couples.

## IV.  Conclusion

"Intentional discrimination on the basis of gender by state
actors violates the Equal Protection Clause, particularly
where, as here, the discrimination serves to ratify and
perpetuate invidious, archaic, and overbroad stereotypes
about the relative abilities of men and women."  *J.E.B.*,
511 U.S. at 130–31.  Idaho and Nevada's same-sex marriage
proscriptions *are* sex based, and these bans *do* serve to
preserve "invidious, archaic, and overbroad stereotypes"
concerning gender roles.  The bans therefore must fail as
impermissible gender discrimination.

I do not mean, by presenting this alternative analysis, to
minimize the fact that the same-sex marriage bans necessarily
have their greatest effect on lesbian, gay, bisexual, and
transgender individuals.  Still, it bears noting that the social
exclusion and state discrimination against lesbian, gay,
bisexual, and transgender people reflects, in large part,
disapproval of their nonconformity with gender-based
expectations.[12]    That is, such individuals are often
discriminated against because they are not acting or speaking
or dressing as "real men" or "real women" supposedly do.
"[S]tereotypes about homosexuality are directly related to our
stereotypes about the proper roles of men and women."

---

[12] Although not evidently represented among the plaintiff class,
transgender people suffer from similar gender stereotyping expectations.
*See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000)
(discrimination on the basis of transgender status is also gender
discrimination).

*Centola v. Porter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002); *see also* Andrew Koppelman, *Why Discrimination Against Lesbians and Gay Men is Sex Discrimination*, 69 N.Y.U. L. Rev. 197 (1994). The same-sex marriage prohibitions, in other words, impose harms on sexual orientation and gender identity minorities precisely because they impose and enforce *gender*-normative behavior.

I do recognize, however, that the gender classification rubric does not adequately capture the essence of many of the restrictions targeted at lesbian, gay, and bisexual people. Employment discrimination, housing discrimination, and peremptory strikes on the basis of sexual orientation, to name a few of the exclusions gays, lesbians, and other sexual orientation minorities have faced, are primarily motivated by stereotypes about sexual orientation; by animus against people based on their nonconforming sexual orientation; and by distaste for same-sex sexual activity or the perceived personal characteristics of individuals who engage in such behavior. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620 (1996); *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (2014). And those sorts of restrictions do not turn directly on gender; they do not withhold a benefit, choice, or opportunity from an individual because that individual is a man or a woman. Although the gender stereotyping so typical of sex discrimination may be present, *see generally* Koppelman, 69 N.Y.U. L. Rev. 197, those restrictions are better analyzed as sexual orientation discrimination, as we did in *SmithKline*. 740 F.3d at 480–84.

As to the same-sex marriage bans in particular, however, the gender discrimination rubric does squarely apply, for the reasons I have discussed. And as I hope I have shown, the concepts and standards developed in more than forty years of

constitutional sex discrimination jurisprudence rest on the understanding that "[s]anctioning sex-based classifications on the grounds that men and women, simply by virtue of their gender, necessarily play different roles in the lives of their children and in their relationships with each other causes concrete harm to women and to men throughout our society." Deborah A. Widiss et al., *Exposing Sex Stereotypes in Recent Same-Sex Marriage Jurisprudence*, 30 Harv. J. L. & Gender 461, 505 (2007). In my view, the same-sex marriage bans belie that understanding, and, for that reason as well, cannot stand.